UNITED STATES of America, Plaintiff–Appellee,

v.

Humberto MELCHOR–LOPEZ, Defendant–Appellant.

UNITED STATES of America, Plaintiff–Appellee,

v.

Gregory KOMMATAS, Defendant–Appellant.

Nos. 79–1235; 79–1247.

United States Court of Appeals, Ninth Circuit.

April 2, 1980.

Before MERRILL and WRIGHT, Circuit Judges, and BARTELS,* District Judge.

BARTELS, District Judge:

Humberto Melchor–Lopez and Gregory Kommatas appeal from judgments of conviction entered in the United States District Court for the District of Arizona after a jury trial in the Southern District of California, *Frey, J.*, pursuant to a motion for change of venue.

Appellants and several co–defendants [1] were charged on a seven–count superseding indictment under which they were adjudged guilty of a conspiracy on count six to import heroin and cocaine, in violation of 21 U.S.C. § 963,[2] and of a conspiracy in count seven to possess with intent to distribute heroin and cocaine, in violation of 21 U.S.C. § 846.[3] The superseding indictment alleged no overt acts in these counts. Appellants were sentenced on March 6, 1979, Lopez to a term of imprisonment of four years with a three–year special parole term on each count, and Kommatas to a term of seven years with concurrent special parole terms of five years on each count. This appeal followed.

---

* The Honorable John R. Bartels, United States District Judge for the Eastern District of New York, sitting by designation.

1. Co–defendants charged in this superseding indictment were Albert Peter Anastasio, Charles Joseph Battaglia, Jr., Michele Catalanotto, Joseph Rae, Salvatore Rina, and Robert Louis Talbot.

2. Section 963 of Title 21 of the United States Code provides:

   Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

3. Section 846 of Title 21 of the United States Code provides:

   Any person who attempts or conspires to commit any offense defined in this subchap-. ter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

Both appellants assert several grounds for reversal of their convictions, including, in particular, the claim that the government failed to present sufficient evidence of an agreement to sustain a conspiracy charge as to either appellant on either count. Because we reverse on the ground of insufficiency of the proof as to that essential element of the conspiracy offense, we need not reach any of the remaining contentions.

## I.

The key figure in the alleged conspiracy was Salvatore Rina, an indicted co-conspirator, who sought to act as an intermediary in bringing together appellant Melchor–Lopez, as supplier of heroin and cocaine, and appellant Kommatas, as purchaser. In an effort to find a supplier of the narcotics, Rina contacted Frank Noriega, a paid government informant, in July or August 1977 and subsequently, in an effort to secure a purchaser for the substances, contacted Kommatas. Although Rina dealt with both appellants in laying the groundwork for a transaction, his scheme was never realized and Melchor–Lopez never met Kommatas. Whether the inferences drawn by the jury in reaching its verdict from largely undisputed circumstances surrounding Rina's dealings with appellants were permissible and proper are the essence of this appeal.

## MELCHOR–LOPEZ

With respect to appellant Melchor–Lopez, much of the evidence at trial was offered in the form of transcripts of taped telephone conversations between himself and agent Noriega, in which they explored the possibility of arranging a sale of cocaine or brown heroin and the willingness and ability of Melchor–Lopez to supply the substances from Mexico. In the first of these conversations, on September 5, 1977, he indicated that he could supply four or five kilos of cocaine at $55,000 per kilo, shipment to be made at any time. In the second call, on September 10, 1977, he promised to make inquiries about brown heroin, the price of which he estimated at $50,000 per kilo, and Noriega thereupon suggested a meeting in Tucson, Arizona with Salvatore Rina. Noriega called Melchor–Lopez again on September 19, 1977 to determine when he was coming to the United States and to discuss developments. Melchor–Lopez asked whether the price he had quoted for heroin was acceptable, and Noriega responded that it may have been a little high.

On September 20, 1977, Melchor–Lopez met with Noriega and Rina in Tucson. While the government contends that an agreement was reached at this meeting, the evidence established only that Rina wanted to buy heroin from Melchor–Lopez and that Melchor–Lopez was able and willing to sell the substance upon the satisfaction of certain conditions which he imposed. Indeed, Noriega, the government's informant, testified that no agreement had been reached because Rina maintained that "the first transaction had to be fronted to him in the United States," and that Melchor–Lopez insisted that "he was not going to bring it [the heroin] into the United States," that "he was not going to front it," and that if Rina wanted to transact one kilogram of heroin, "Rina needed to commute to Mexico."[4] This disagreement was never resolved.

4. After admitting that he had been debriefed by agent Berellez concerning the September 20 meeting, informant Noriega testified on cross-examination as follows:

Q: And did you not, sir, tell Agent Berellez the following: "Rina advised that all three, or just he and the Informant could commute to New York to sell the heroin and dispose of it, and after transacting the heroin in New York, he or they would return then with the profit made on the heroin transaction, return and purchase two or three kilograms of heroin from Melchor. Melchor expressed dissatisfaction with Rina's promise and advised Rina if he wanted to transact one kilogram of heroin, that Rina needed to commute to Mexico."
Now, is that not what you told Agent Berellez?
A: Yes, Berrellez.
Q: Is that not what happened?
A: Yes.
Q: And did you not tell the same agent, and I quote, "In concluding the session, Informant

After the meeting, Melchor–Lopez returned to Mexico and Rina informed Noriega that "the transaction could not be managed" because, as proposed by Melchor–Lopez, it was too dangerous. Several phone calls between Melchor–Lopez and Noriega followed, during the course of which Melchor–Lopez quoted a price of $80,000 for one kilo of heroin [5] and a second meeting was arranged, apparently without the participation or knowledge of Rina. This meeting, which occurred in Yuma, Arizona on October 8, 1977, was attended by Melchor–Lopez, his associate Pedro Reyna, Noriega, and Art Berellez, a government agent posing as an associate of Rina. Although the government agents produced $80,000 in an effort to induce Melchor–Lopez to bring heroin into the United States for sale, he steadfastly refused to agree to any such transaction, insisting that any transfer would have to be made in San Luis, Mexico. Thus, notwithstanding abundant evidence of Melchor–Lopez' willingness to discuss and arrange a sale, his preconditions to an agreement were never met.

## KOMMATAS

The evidence concerning appellant Kommatas and his association with Rina were more extensive. Prior to December 1977, Kommatas had known Rina for approximately two years and, while living in New York, had occasional contact with him. After Rina moved to Tucson, he called Kommatas in order to arrange a trip by Kommatas to Arizona to purchase drugs. When he arrived in Tucson on December 7, 1977, Kommatas went with Rina to a meeting attended by government agents Bachelier and Celaya at which the price, quantity, and quality of heroin, and the timing of a possible drug transaction were discussed.

At the meeting, Kommatas, Rina and the agents talked a great deal about heroin pricing mechanisms, and the method of transacting a New York sale. Kommatas explained that heroin pricing depends on the satisfaction of a temperature test; were Kommatas to purchase heroin, he would test a sample and then set a price according to the test results. Neither at the meeting nor at any time thereafter did Kommatas and Rina agree to the sale of a specific amount of heroin at a particular price.

Despite lengthy discussions, the men at this meeting never agreed to a definite plan. At the trial, three participants testified: agents Celaya and Bachelier, and appellant Kommatas. Nowhere in the accounts is there evidence of a mutual understanding to accomplish a specific objective or of an intention to be bound by

---

advised that Rina and Melchor did not reach an agreement, and that further meetings would be scheduled pending Rina's contact with the financiers."
Did you not tell that to the agent?
A: Yes.
Q: And you arrived at this–after the 24th when Rina expressed dissatisfaction to you, and I'll ask you if you did not make this statement to Mr. Berrellez: "Rina expressed dissatisfaction with the proposal, stating that the transaction could not be managed since Rina advised it would be too dangerous and suggested that the heroin could be transacted with the Mexican connection if he would be inclined to transact in Tucson, Arizona."
So when Rina says, "I'm not going to have anything to do with that proposal," it was at that time that DEA agents and DPS agents came in and you decided to meet in San Luis, right?
A. Right.
Tr. at 171–74.

5. On October 4, 1977, at 8:45 p.m., informant Noriega called Melchor–Lopez to determine the price for heroin, and the following conversation occurred:

\* \* \* \* \* \*

INFORMANT: All right. Ah, what you told me, how much will it come out to?
MELCHOR: Well, they sell–well they sell it at twelve, the sheet. Well, it's got 40 sheets a bundle, isn't that right?
INFORMANT: Uh–huh.
MELCHOR: It comes out at eighty.
INFORMANT: It comes out at eighty?
MELCHOR: Well, yes.
INFORMANT: It's more expensive than the pure.
MELCHOR: Well, they told me it was very good.
INFORMANT: That it was?
MELCHOR: I don't know, you have to go and taste.
INFORMANT: All right.

\* \* \* \* \* \*

Tr. at 133–34.

any agreement. There was evidence of later telephonic communication among Bachelier, Rina, and Kommatas, during which Kommatas (in New York) told Bachelier and Rina (in Tucson) that he needed more time to line up buyers. This indicates that the December 7 meeting culminated not in agreement that Kommatas would purchase heroin, but in an understanding that Kommatas would return to New York and attempt to find buyers.

Other evidence consisted of meetings between Rina and various government agents, statements by Rina characterizing Kommatas as the "New York moneyman,"[6] and promises by Rina that Kommatas would appear at various meetings, none of which Kommatas actually attended, or would send the thermometer and oils necessary for testing, which, again, Kommatas never did. Also introduced were numerous telephone toll slips showing repeated phone calls from Rina to Kommatas' home and suggesting, according to the government, attempts by Rina to get financial commitments from Kommatas for narcotics to be brought into the United States by Melchor–Lopez. These phone calls occurred both before and after the meeting attended by Kommatas on December 7, 1977. As characterized by the government, the unmistakable inference to be drawn from this evidence is that Kommatas joined the conspiracy and acted throughout the relevant period to promote the object of the conspiracy: the importation and sale of heroin. We disagree.

## II

■ We recognize, as we must, that the initial inquiry on review of the sufficiency of the evidence to support a criminal conviction is whether, after "viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *United States v. Bailey,* 607 F.2d 237 at 242 (9th Cir. 1979). The essential elements of conspiracy, which have been stated repeatedly in the decisions of this circuit, are "an agreement to accomplish an illegal objective coupled with one or more overt acts in furtherance of the illegal purpose and the requisite intent necessary to commit the underlying substantive offense." *United States v. Oropeza,* 564 F.2d 316, 321 (9th Cir. 1977); *United States v. Monroe,* 552 F.2d 860, 862 (9th Cir.), *cert. denied,* 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1009 (1977); *United States v. Friedman,* 593 F.2d 109, 115 (9th Cir. 1979); *United States v. Bailey, supra,* at 242.[7] Thus, the gist or gravamen of this crime is an agreement to effectuate a criminal design, and, obviously, it is not necessary to the crime of conspiracy that its object be accomplished. *United States v. Croxton,* 482 F.2d 231, 233 (9th Cir. 1973). Although the evidentiary requirement for establishment of an agreement in the conspiracy context is considerably more lax than in the case of an enforceable contract, W. LaFave & A. Scott, *Criminal Law* 460–61 (1972), inferences of the existence of such an agreement may be drawn "if there be concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose." *United States v. Monroe,* 552 F.2d at 862–863; *United States v. Camacho,* 528 F.2d 464, 469 (9th Cir.), *cert. denied,* 425 U.S. 995, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976); *see Developments in the Law of*

---

6. At a meeting on August 17, 1978, which was video–taped by government agents, Rina told undercover agents attending the meeting:

> Greggory, Gregorio, my partner, will be where the merchandise is at. My partner and nobody else. We got the money there. You count the money and Gregory make the test.

> \* \* \* \* \* \*

All the money will be clean and not counterfeit money, understand me? This is extremely important. Then it'll be myself, Gregorio, and you that make the deal. I don't want to meet anyone.

*Tr.* at 357.

7. As appears *infra* at 891, a number of circuits have concluded that proof of an overt act is no longer required under the statutes here involved.

Criminal Conspiracy, 72 Harv.L.Rev. 920, 925–27 (1959); Note, Resolution of Multiple Conspiracies Issue Via "Nature of the Enterprise" Analysis: The Resurrection of Agreement, 42 Brooklyn L.Rev. 243, 245–54 (1975).

■ The agreement need not be explicit, but may be inferred from circumstantial evidence, United States v. Thomas, 586 F.2d 123, 132 (9th Cir. 1978); United States v. Oropeza, 564 F.2d at 321, and once the existence of a conspiracy is established, "evidence establishing beyond a reasonable doubt a connection of a defendant with the conspiracy, even though the *connection is slight*, is sufficient to convict him with knowing participation in the conspiracy." United States v. Dunn, 564 F.2d 348, 357 (9th Cir. 1977) (emphasis in original); United States v. Bailey, supra, at 242–243. On the other hand, there can be no conviction for guilt by association, and it is clear that mere association with members of a conspiracy, the existence of an opportunity to join a conspiracy, or simple knowledge, approval of, or acquiescence in the object or purpose of the conspiracy, without an intention and agreement to accomplish a specific illegal objective, is not sufficient to make one a conspirator. Miller v. United States, 382 F.2d 583, 587 (9th Cir. 1967); United States v. Basurto, 497 F.2d 781, 793 (9th Cir. 1974); United States v. Cloughessy, 572 F.2d 190, 191 (9th Cir. 1977); United States v. Richardson, 596 F.2d 157, 162 (6th Cir. 1979); United States v. Collins, 552 F.2d 243, 245 (8th Cir.), cert. denied, 434 U.S. 870, 98 S.Ct. 214, 54 L.Ed.2d 149 (1977); United States v. Hassell, 547 F.2d 1048, 1053 (8th Cir.), cert. denied, 430 U.S. 919, 97 S.Ct. 1338, 51 L.Ed.2d 599 (1977); United States v. Quintana, 508 F.2d 867, 881 (7th Cir. 1975). While each of these circumstances may be a relevant factor to be considered in a given case where existence of an agreement is in issue, no mere suspicion or surmise is permitted to replace the essential analysis of the qualitative nature of the acts in question. United States v. Taylor, 562 F.2d 1345, 1352 (2nd Cir.), cert. denied, 432 U.S. 909, 97 S.Ct. 2958, 53 L.Ed.2d 1083, 434 U.S. 853, 98 S.Ct. 170, 54 L.Ed.2d 124 (1977). The line between conspiracy and an unexercised opportunity to join a conspiracy may be difficult to draw, but it must be drawn where the existence of an agreement is absent.

■ We believe that the evidence offered in this case to show an agreement between either appellant and Salvatore Rina falls short of the minimum required under the precedents of this circuit. As to Melchor, the evidence fell far short of showing an agreement because Melchor firmly insisted on certain conditions unacceptable to his would–be co–conspirators. In light of agent Noriega's September 20 report which concluded: "Rina and Melchor did not reach an agreement," (fn. 4, supra) we hold that no reasonable trier of fact could have found Melchor guilty beyond a reasonable doubt. To infer the existence of an unlawful agreement upon such proof would, in our judgment, "overemphasize a rule of evidence [that an agreement may be inferred from surrounding circumstances] at the expense of a rule of law [that proof of an agreement is required for the crime of conspiracy]." Developments in the Law of Conspiracy, supra, at 933. While direct evidence of an agreement is clearly not essential, this evidentiary principle does not reduce the government's burden of proof through other means as to the substantive elements of the offense.

In support of Melchor–Lopez' conviction, the government places great reliance upon his September 20, 1977 meeting with Rina and Noriega as the date he entered into two separate criminal conspiracies: one, to import heroin and cocaine, and the other, to possess such substances with intent to distribute them. Such a reading of the evidence is belied, however, by the testimony of informant Noriega that no agreement was reached at that meeting and that even Rina stated that the "transaction could not be managed." Moreover, while Melchor–Lopez certainly expressed an interest in "doing something," he firmly refused to commit himself unless the money were delivered in advance, which did not occur.

Unlike the situation in *United States v. Croxton, supra,* cited by the government, where the agreement was firm and only the means of transportation remained undetermined, Melchor–Lopez consented to nothing more than his appearance at the September 20 meeting with Rina. When this meeting, which was Melchor–Lopez' only contact with Rina, failed to produce an agreement, government agents continued their efforts to engineer a transaction by posing as Rina's agents, which maneuvers were similarly unsuccessful. Absent proof of other contacts establishing a "meeting of the minds" between Melchor–Lopez and Rina, we believe that the inferences urged by the Government are too tenuous to support a conclusion by a rational juror of appellant's guilt beyond a reasonable doubt, and, accordingly, his conviction cannot stand.

Kommatas came closer to the line separating preliminary negotiations and active participation, but he did not cross it. At the December 7 meeting, in Tucson, Kommatas made a number of statements about heroin pricing, and about possible methods of carrying out a New York drug delivery. No such agreement was ever reached. As the subsequent telephone calls make clear, the Tucson meeting did not culminate in an agreement to purchase a controlled substance, but in an agreement to negotiate such a purchase. The law requires more than a conspiracy to attempt to arrange a purchase; it requires an agreement to carry out an illegal act. No such agreement was proven.

The government correctly points out that conspiracies rarely are memorialized by a written contract, and are generally proven by circumstantial evidence. A recitation of this rule, however, does not relieve the government of its burden to prove every element of the crime beyond a reasonable doubt. Here the government proved that each appellant engaged in conversations which might have ended in firm commitments but it failed to establish the "meeting of the minds" to consummate an illegal transaction which is essential to conspiracy. *United States v. Basurto,* 497 F.2d at 793; *United States v. Trowery,* 542 F.2d 623, 626 (3rd Cir. 1976), *cert. denied,* 429 U.S. 1104, 97 S.Ct. 1132, 51 L.Ed.2d 555 (1977).

To hold that this evidence is sufficient to establish an agreement between Kommatas and Rina to import and sell narcotics would introduce an unwarranted vagueness of proof as to this most basic element of conspiracy. Such an innovation would assess criminal liability for mere expression of general intent and would, it seems to us, stretch the definition of conspiracy beyond acceptable boundaries, particularly in view of the recent decisions of several circuits eliminating the requirement of proof of an overt act in conspiracy prosecutions. *See United States v. Knuckles,* 581 F.2d 305, 311 (2nd Cir.), *cert. denied,* 439 U.S. 986, 99 S.Ct. 581, 58 L.Ed.2d 659 (1978); *United States v. Johnson,* 575 F.2d 1347, 1366 (5th Cir. 1978), *cert. denied,* 440 U.S. 907, 99 S.Ct. 1214, 59 L.Ed.2d 454 (1979); *United States v. Cruz,* 568 F.2d 781, 782 (1st Cir. 1978); *United States v. Umentum,* 547 F.2d 987, 989–91 (7th Cir. 1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1677, 52 L.Ed.2d 376 (1977); *United States v. Dreyer,* 533 F.2d 112, 117 (3rd Cir. 1976); *but see United States v. King,* 521 F.2d 61, 63 (10th Cir. 1975). We conclude that upon the evidence of exploratory and inconclusive discussions in which Kommatas took part in this case, no rational juror could have found beyond a reasonable doubt that a conspiracy existed between Kommatas and any of the indicted co–conspirators.

Motions by appellants for acquittal should have been granted by the trial court. Accordingly, the convictions of appellants Melchor–Lopez and Kommatas must be, and hereby are, REVERSED.