## UNITED STATES of America, Plaintiff,

v.

## Donald PODOLSKY, Defendant.

## No. 85 CR 7.

United States District Court,
N.D. Illinois, E.D.

Nov. 1, 1985.

Suzanne B. Conlon, Asst. U.S. Atty., Chicago, Ill., for plaintiff.

Patrick A. Tuite, Patrick A. Tuite, Ltd., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

Defendant Donald Podolsky, a City of Chicago fireman, was charged in a three-count indictment with: (1) conspiracy under 18 U.S.C. § 371 to commit arson in violation of 18 U.S.C. § 844(i) and to possess an unregistered firearm in violation of 26 U.S.C. §§ 5861(d) and 5871; (2) attempted arson in violation of 18 U.S.C. § 844(i); and

(3) possession of and failure to register a firearm in violation of 26 U.S.C. §§ 5861(d) and 5871. Following a brief bench trial Podolsky moved for a judgment of acquittal as to all three counts and the government sought conviction. Because this case involved significant legal issues, both the government and the defendant sought and were given leave to file post-trial memoranda of law. After considering all the evidence and reviewing these memoranda, we grant defendant's motion of acquittal as to Count III and deny it as to Counts I and II of the indictment. We find the defendant guilty beyond a reasonable doubt as to Counts I and II.

### I.

There is no dispute as to the following facts which came out at trial and appear in the record. Ron Ziedman, a government informant, approached Podolsky in November 1984 with a proposition that Podolsky burn a building for a fee of $5,000. Apparently, Podolsky and Ziedman had once discussed such a deal a year or two before, but the deal had never come to fruition. *See* Gov't.Ex. 15A at 3–4. Ziedman claimed that the owner of the building in question, located at 2436 W. Division in Chicago, wanted this vacant building burned to collect insurance money. During their first few conversations, Podolsky balked at the deal. *See, e.g.,* Gov't.Ex. 15A at 4; Gov't.Ex. 16A at 1–3. But Podolsky eventually warmed to the idea, lured by the offer of money. *See* Gov't.Ex. 17A at 5. Podolsky and Ziedman agreed in general that $2,500 would be paid in front and $2,500 after the job was done. Podolsky told Ziedman he worked with a partner, who turned out to be co-defendant and fellow firefighter Charles Hawkins,[1] but did not disclose who the partner was.

At about this time, late November or early December, Podolsky asked Hawkins at work if he was willing to burn a building with Podolsky for $2,500. Hawkins thought it over for a couple of days and agreed. Podolsky was to handle the arrangements, while Hawkins would accompany Podolsky for the job itself.

Podolsky and Ziedman had several conversations and meetings between late November and January 4, 1985, the day that Podolsky and Hawkins were arrested. On December 13, 1984, Podolsky and Ziedman drove to the targeted building. During their drive Podolsky boasted about some previous "jobs" he had done. *See, e.g.,* Gov't.Ex. 18A at 3, 13. Podolsky observed that the building at 2436 W. Division ("the 2436 building") was vacant, with open windows and would therefore burn quickly and easily. *Id.* at 21. However, during this reconnaissance mission, Podolsky affirmed, as he would several times later, that he would not agree to burn a building with people in it:

> Ziedman: If there were people in the building, I don't touch it, man.
>
> Podolsky: No, I don't want nothin' to do with killing somebody.
>
> Ziedman: No, no way.

*Id.* at 6.

Sometime shortly thereafter, the government must have realized that the vacant 2436 building had its natural gas line shut off, so that jurisdiction might be lacking for a federal arson prosecution concerning that building. Thus, Ziedman called Podolsky and said he wanted the building at 2438 Division ("the 2438 building") burned, as well as the 2436 building. Podolsky said then, and several other times, that he would not burn the 2438 building if there were people in it; but relying upon repeated assurances from Ziedman that the building would be vacated, Podolsky agreed to burn the second building for an extra $5,000:

> Ziedman: [H]ere's what I want. You have to give me a price though. The building next to it.
>
> Podolsky: I can do it.

---

1. Hawkins pled guilty to Counts I and III and testified for the government at trial. In light of our ruling in Part IV below, Hawkins' plea of guilty to Count III will be vacated and that count will be dismissed. It is so ordered.

Ziedman: 2438 Division. Not the first, see.

Podolsky: There's people in that, Z, I can't.

Ziedman: They'll be out of there.

Podolsky: When?

Ziedman: They are being moved out today. The landlord is moving them out today.

   \*    \*    \*    \*    \*    \*

Ziedman: I want them both down. They will be out you know what I'm saying or not?

Podolsky: Yeah.

Ziedman: \* \* \* How much do you want, more? Do you think I'm joking?

Podolsky: Well, you know. I want to make sure there ain't nobody in there at all, period.

   \*    \*    \*    \*    \*    \*

Ziedman: The ... landlord is getting them out today.

   \*    \*    \*    \*    \*    \*

Ziedman: How much more do you want?

Podolsky: Same thing.

Ziedman: The same thing, right. OK. In other words, I hand you 5,000. Right?

Podolsky: Yeah.

Ziedman: And 5,000 on delivery, right?

Podolsky: Yeah.

Ziedman: I think they will be out.

Podolsky: Yeah.

Ziedman: Today.

Podolsky: OK.

   \*    \*    \*    \*    \*    \*

Ziedman: They are going to be out. You going to do it or not?

Podolsky: Sure.

Ziedman: If you don't, say "no." Just tell me.

Podolsky: Yeah. I told you.

From this and other exchanges, it is clear that Podolsky's agreement to burn the 2438 building was conditioned on its being vacant on the date of the fire. Similarly, it

is clear from Hawkins' testimony and his interview with government authorities that he and Podolsky agreed and understood that they would not burn the 2438 building if people were in it.

On Saturday, December 16, 1984, Podolsky told Hawkins at work that they would buy materials two days later, Monday, and burn the building [2] that evening. They discussed what materials to buy and agreed on gasoline, brake fluid and chlorine. When mixed together, chlorine and brake fluid react chemically, releasing heat in the process. The release of heat eventually ignites the gasoline. But the chlorine/brake fluid reaction can be slow enough so that the firemen could start the reaction and drive away from the building before the fire would begin. The evidence showed that the device ultimately constructed in this case would burn intensely but not explode.

On December 17, 1984, Podolsky postponed the "job" because of an arson the evening before which killed a mother and her four children and which gained much play in the media. Podolsky told Ziedman and Hawkins he was worried about police watching vacant buildings for a while, and so he wanted to wait "till this heat, uh, comes down." Gov't.Ex. 20A at 2.

Podolsky put off Ziedman for several days, but on December 27, 1984, he finally rescheduled the job for Friday evening, January 4. He repeated that the buildings must be vacant by then. *See* Gov't.Ex. 23A at 4. That day Podolsky told Hawkins that the deal was on again and included another building for an additional $5,000. Podolsky did not then tell Hawkins when or where the job would occur. Two days before the day for the fire, Podolsky told Hawkins of the date of the job. He also told Hawkins that the second building was occupied but would be vacant by the time of the fire.

Podolsky and Hawkins spent several hours together on Friday, January 4, pre-

---

**2.** Ziedman did not mention the 2438 building until the next day, the 17th. Thus, as of that

Saturday Podolsky and Hawkins had agreed only to burn the 2436 building.

paring for their evening's work. They bought ten pounds of a chlorine compound, two twelve-ounce containers of brake fluid and a package of styrofoam cups. That evening Podolsky introduced Hawkins and Ziedman at Fluky's, a northside restaurant. They went out to Podolsky's car, which had the materials in the back seat. Podolsky showed Ziedman the materials, explained how brake fluid and chlorine would ignite the gasoline and then accepted $5,000 in cash from Ziedman. Podolsky and Hawkins dropped the money off at Podolsky's apartment and drove toward the target buildings, stopping to get gasoline along the way. Also while en route, Hawkins crushed chlorine tablets into two cups in order to prepare the ignition mixture.

Podolsky and Hawkins agreed in the car that if people were around the buildings, they would not burn them. If questioned, they would say they were there to board up the buildings. They drove past the buildings and then into an alley behind the buildings. Leaving the chemicals in the car, they walked to the buildings to check them out. They saw a light in the 2438 building and agreed that they could not burn it then because they assumed it was occupied. They walked to the basement of the 2436 building to see if it was occupied, but were then greeted and arrested by police officers.

## II.

■ Count One of the indictment charges Podolsky and Hawkins with a two-pronged conspiracy. The government alleges first that, in violation of 18 U.S.C. § 371,[3] they conspired to burn the 2438 building, which would have violated 18 U.S.C. § 844(i). Second, Hawkins and Podolsky allegedly conspired to possess an unregistered firearm as defined in 26 U.S.C. §§ 5845(a) and (f) in violation of 26 U.S.C. §§ 5861(d) and 5871.[4] Podolsky challenges the conspiracy to commit arson charge on two levels. He asserts that, assuming that Podolsky and Hawkins did agree to burn the 2438 building, the government improperly manufactured federal jurisdiction over what is essentially a state law arson offense; thus, he concludes that the Court lacks jurisdiction. He asserts in the alternative that the evidence fails to show that he and Hawkins ever actually agreed (and thus conspired) to burn the 2438 building, because an essential precondition to such an agreement, that the building would be vacant, was never fulfilled. We consider and reject each contention in turn.[5]

## A.

■ The parties agree that the courts have extended broad federal jurisdiction over prosecutions under 18 U.S.C. § 844(i). Enacted under the full jurisdictional breadth of the Commerce Clause, § 844(i) "is a very broad provision covering substantially all business property." *United States v. Zabic,* 745 F.2d 464, 470 (7th Cir.1984), *quoting,* H.R.Rep. No. 91–1549, 91st Cong.2d Sess., *reprinted in* 1970 U.S.

---

3. That section provides:

   If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

4. As discussed in Part IV, the government's theory is that the gasoline, chlorine, brake fluid and sytrofoam cups were the components of a "destructive device" as defined in 26 U.S.C. § 5845(f) and thus had to be registered with the federal government as a "firearm."

5. That part of Count I which charges a conspiracy to possess a firearm is subsumed in our conclusion in Part IV that the materials were not part of a "firearm" as defined by 26 U.S.C. § 5845(f). Accordingly, Count I is dismissed to the extent it charges a conspiracy to possess an unregistered firearm. It is so ordered. Of course, this order does not impair Count I to the extent it alleges a conspiracy to violate § 844(c). When an indictment charges a conspiracy to violate two statutes, the defendant may be found guilty if the trier of fact believes beyond a reasonable doubt that he conspired to violate either one of the statutes. *See, e.g., United States v. Muelbl,* 739 F.2d 1175, 1183 (7th Cir. 1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 388, 83 L.Ed.2d 322 (1984).

Code Cong. & Ad.News 4007, 4046. In *Zabic*, the Court held that federal jurisdiction existed under § 844(i) in an arson prosecution concerning a rental apartment building. The Court found that the owner used the building exclusively for commercial purposes, and thus was "within the ambit of commercial 'business property,' alluded to by Congress" in passing § 844(i). *Id.* at 470–71. The Court added that the fact that the building received natural gas from out-of-state, further affecting interstate commerce, bolstered its assertion of jurisdiction. *Id.* at 470–71. It is clear from *Zabic* and the many cases it cites that § 844(i) confers federal jurisdiction so long as destruction of the building would have even a *de minimis* effect on interstate commerce.

██ The 2438 building contained two rental units and a printing brokerage office which received trade journals through the mail. It also received natural gas from Tennessee and Kentucky. An attempt to destroy the 2438 building would clearly confer jurisdiction under § 844(i). *See Zabic*, 745 F.2d at 470–71; *also United States v. Russell*, — U.S. —, 105 S.Ct. 2455, 85 L.Ed.2d 829 (1985) (two-flat rental apartment building is "business property" within § 844(i) ), *aff'g.*, 738 F.2d 825, 827 (7th Cir. 1984). Just as clearly, jurisdiction would not have existed over an attempted arson of the vacant 2436 building, which did not even receive natural gas.[6]

Podolsky does not really dispute that the above discussion reflects the state of the law, and that jurisdiction would normally exist over an attempt to burn the 2438 building. His jurisdictional challenge is a narrow one. Relying on *United States v. Archer*, 486 F.2d 670 (2d Cir.1973), Podolsky argues that the government improperly fabricated federal jurisdiction in this case. He points out how the government realized during the undercover operation that a conspiracy to burn the 2436 building would not be a federal offense, so for the sole reason of creating jurisdiction, it expanded the al-

leged conspiracy to include the 2438 building. It further manipulated the facts, says Podolsky, to lull him into thinking that the 2438 building was vacant, knowing that Podolsky would not agree to burn an occupied building. He claims that *Archer* compels dismissal on these facts. Assuming the truth of these facts, we disagree.

*Archer* is an unusual case and has been read narrowly. The court dealt there with a federal undercover operation of a state district attorney's office. The operation involved extensive misconduct by federal agents and prosecutors. However, rather than rule on the grounds of outrageous misconduct or entrapment, Judge Friendly, writing for the *Archer* court, ruled on the narrower, more technical ground that the court lacked jurisdiction under the Travel Act. In that case the corruption investigated was essentially a local affair. The federal officials set out to manufacture federal jurisdiction by phoning one of the defendants from out of state for the precise purpose of turning a local into a federal offense. Calling this episode "totally fabricated," the court held:

> [W]hen Congress responded to the Attorney General's request to lend the aid of federal law enforcement to local officials in the prosecution of certain crimes, primarily of local concern, where the participants were engaging in interstate activity, it did not mean to include cases where the federal officers themselves supplied the interstate element and acted to ensure that an interstate element would be present. Manufactured federal jurisdiction is even more offensive in criminal than in civil proceedings.... As the late Judge Freedman said with respect to civil actions ... manufactured jurisdiction 'is a reflection on the federal judicial system and brings it into disrepute.' (Citations omitted.)

486 F.2d at 682. In its denial of the government's petition for rehearing, the court emphasized the narrowness of its holding:

---

6. We do not intimate that federal jurisdiction would have existed concerning the vacant 2436

building if the natural gas line were turned on. We express no opinion on that point.

[W]hen the federal element in a prosecution under the Travel Act is furnished solely by undercover agents, a stricter standard is applicable than when the interstate or foreign activities are those of the defendants themselves....

*Id.* at 686.

Though a cousin of doctrines like entrapment or outrageous governmental misconduct, this "manufactured jurisdiction" doctrine differs from these doctrines. For example, entrapment occurs when a government agent entices an unpredisposed defendant to commit a crime he would not otherwise commit; the *Archer* case comes into play when a defendant would or did commit a state crime, but the government agent injects an artificial element into the case for the sole purpose of creating a federal prosecution. *See United States v. Kaye,* 593 F.Supp. 193, 195 (N.D.Ill.1984). But later cases in the Second and other Circuits have "carefully limited" the scope of *Archer. See United States v. Lau Tung Lam,* 714 F.2d 209, 210–22 (2d Cir. 1983) (defendant himself committed substantive jurisdictional act of bringing drugs into country), *cert. denied,* 464 U.S. 942, 104 S.Ct. 359, 78 L.Ed.2d 322 (1983); *United States v. Giordano,* 693 F.2d 245, 250–51 (2d Cir.1982) (*Archer* distinguished in case under 18 U.S.C. § 844(i) where defendant agreed with government agents to destroy a fictitious store); *United States v. Jannotti,* 673 F.2d 578, 610–11 (3d Cir.) (en banc) (reversing judgment of acquittal in the largely fictitious "ABSCAM" undercover operation), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982).

*Archer* does not apply to this case. There the federal officials made out-of-state calls for the purpose of creating jurisdiction. The defendant himself initiated or conducted *no* activities of jurisdictional significance; he merely responded to the calls from federal officials, and, in any event, those calls were not significant to furthering the essentially local bribery scheme. In short, the defendant in *Archer* neither agreed to do nor did anything with interstate consequences; the federal officials did it all. In contrast, Podolsky himself agreed to do acts with interstate consequences. He agreed with Hawkins[7] to burn the 2438 building. Although federal agents set this additional plot in motion, Podolsky willingly carried the plot along. There was an agreement *by the defendant* not merely to commit a local crime of arson, but to burn a building which falls under the wide umbrella of 18 U.S.C. § 844(i).

It is true that jurisdiction was "fabricated" in the sense that federal officials belatedly picked the 2438 building as a target because of its "interstate" character. Had they not done this, Podolsky would not be in federal court. But that is not fabrication in the *Archer* sense. If they had chosen that building initially, *Zabic* and *Russell* would clearly apply and no colorable *Archer* issue would be raised.[8] We do not think that the *timing* of the selection of the 2438 building is relevant to jurisdiction, so long as Podolsky and Hawkins agreed on their own to burn that building. "Fabrication" as defined in *Archer* means that federal agents *themselves* try to supply the interstate element to a crime that is otherwise local. Here the agents "supplied" the building, but the building *already* was of an interstate character under § 844(i), and the defendants themselves *did* allegedly agree to burn it. The present case would have been fabricated in the *Archer* sense if, for example, agents

---

**7.** For the purposes of resolving the jurisdictional dispute, we merely assume at this point that Hawkins and Podolsky had actually agreed to burn the 2438 building. In Part III below, we hold that this assumption turns out to be correct.

**8.** Podolsky does not argue that there would have been a jurisdictional problem if the agents had selected the 2438 building in the first place. Federal agents could have lawfully chosen that building initially over another, even if they were doing so for jurisdictional reasons. Jurisdiction would exist because § 844(i) is so broad that it encompasses such a building. This statute would not be defeated simply because the officials chose it as a target.

turned on the natural gas at the 2436 building merely to attempt to create jurisdiction. In such a situation, they would have themselves supplied the interstate element just as the agents in *Archer* made a phone call to create jurisdiction. But in this case, the 2438 building already received natural gas and mail and housed some businesses. The federal officials did not supply these elements. In sum, then, we hold that federal jurisdiction exists in this case.

## B.

■ We turn next to Podolsky's substantive attack on Count I. He claims that he and Hawkins never conspired to burn the 2438 building because an essential precondition to such an agreement, that the building be vacant, was never fulfilled. We agree that such a condition existed, but we disagree that it was a *precondition* to an agreement.

Podolsky's argument focusses on the following conceptual distinction: he essentially is saying that the condition that the building be vacant *preceded* the formation of the *agreement* itself to burn it. He implicitly distinguishes this characterization of the facts from a closely related one: that he and Podolsky actually agreed to burn the building, subject to the condition that it be empty. In the first scenario, no agreement exists, because a precondition to reaching an agreement never is fulfilled. In the second one, an agreement exists, albeit a conditional one. We think the second scenario is the accurate one.

The facts material to this issue are not disputed; only the characterization of them is. There is no question that Podolsky and Hawkins intended to burn the 2438 building on January 4, 1985, if it was unoccupied. The price was set at $10,000. The materials were bought. They received the $5,000 advance payment. They were on the way to the building itself, with Hawkins crushing the chlorine. None of this would have happened without a basic "meeting of the minds" or understanding. The evidence in this case clearly shows that they agreed to burn the building. It was a conditional agreement, but an agreement nevertheless. Podolsky's characterization of the facts is distorted. He and Hawkins did not receive $5,000 and drive to the 2438 building, materials ready, without an agreement. They did not approach the building merely to decide then and there whether to agree to burn it. When they approached the building they clearly already had agreed to burn it. They were investigating the building, not to determine whether to agree to burn it, but to see whether anyone was inside so it would be safe to burn it.

18 U.S.C. § 371 requires that the government prove that Podolsky and Hawkins agreed to commit an offense which violates United States law, coupled with at least one overt act committed by one or both with the intent to commit the underlying offense. *See, e.g., United States v. Melchor-Lopez,* 627 F.2d 886, 890 (9th Cir. 1980). The government may prove a conspiracy by circumstantial evidence. *See, e.g., United States v. Herrera,* 757 F.2d 144, 149 (7th Cir.1985). We think the evidence proves beyond a reasonable doubt that Podolsky and Hawkins agreed to burn the 2438 building in violation of § 844(i).

Podolsky relies principally upon two cases, both of which are distinguishable. In neither case was an actual agreement or meeting of the minds reached. In *United States v. Melchor-Lopez,* 627 F.2d 886 (9th Cir.1980), no agreement was ever reached because the defendant had imposed preconditions to agreement which were never met. The case involved discussions concerning a drug purchase, but government agents in the case admitted that no agreement had been reached because the defendant insisted an agreement depended on delivery of money in advance and on conducting the transactions in Mexico. 627 F.2d at 891–92. In *United States v. Jones,* 765 F.2d 996 (11th Cir.1985), another drug case, the defendants had seriously entertained participating in a drug smuggling deal, but never reached an agreement. The Court noted there that "as a factual matter ... what we have are proposals that never

ripened into an agreement except agreement ... to submit [the proposals to a third party].... There is nothing to show that [the alleged conspirators] ever agreed to do anything whatever in the event, which occurred, that [the third-party] rejected their proposals." 765 F.2d at 1001. Relying on *Melchor-Lopez*, the Court held that "the mere submission of proposals such as we have here, with preconditions not met" was not a criminal conspiracy. *Id.* at 1003. Unlike these two cases, in this case we have a defendant who was well beyond the "negotiation" or "proposition" stage. We have found that, as a factual matter, Podolsky and Hawkins clearly had a firm agreement to burn the 2438 building. The condition concerning the building's vacancy was part of the agreement itself, not a precondition to the formation of the agreement in the first place.

The question of whether a conditional agreement constitutes a conspiracy where the condition is not fulfilled is answered by *United States v. Anello*, 765 F.2d 253 (1st Cir.1985). In that case the defendant had agreed to buy marijuana if it was of high enough quality. The Court held that a conditional agreement is, in general, an agreement nevertheless. It noted that most criminal agreements contain conditions, and the key factor to consider is whether the alleged co-conspirators believed the condition was likely to be fulfilled. 765 F.2d at 262–63 (and cases cited therein); *see also* Note, "Conditional Objectives of Conspiracies," 94 Yale L.J. 895 (1985). In this case it is obvious that Podolsky and Hawkins believed the condition would likely be fulfilled. They went to their target, equipped and able to burn it, because they believed it was vacant. The fact that they were surprised that the condition was not met does not negate the fact that an agreement existed.[9] Thus, we conclude that the government has proved a

conspiracy to burn the 2438 building in violation of § 844(i).

### III.

Count II of the indictment charges that Podolsky attempted to commit arson in violation of 18 U.S.C. § 844(i). Asserting that attempt is a specific intent crime, *see United States v. Monholland*, 607 F.2d 1311, 1318 (10th Cir.1979), Podolsky argues that he never formed the specific intent to burn the 2438 building, because of the condition that was unfulfilled. Since he found the building to be occupied on January 4, he never formed the specific intent to burn it, he concludes. We disagree for the reasons we rejected his conspiracy argument. Podolsky clearly intended to burn the 2438 building, had been paid to do it, was ready to do it, was dangerously close to doing it, until he discovered that the building was occupied. This surprise was not a *precondition* to his specific intent to burn the building, but merely prevented him from fulfilling his intent to burn the building.

■■■ The test for attempt is that (1) the defendant act with the kind of culpability otherwise required for the commission of the crime, and (2) that he take a substantial step toward committing the crime, a step which strongly corroborates the firmness of his criminal intent. *See, e.g., United States v. Rovetuso*, 768 F.2d 809, 821 (7th Cir.1985), *citing United States v. Mandujano*, 499 F.2d 370, 376 (5th Cir.1974), *cert. denied*, 419 U.S. 1114, 95 S.Ct. 792, 42 L.Ed.2d 812 (1975). This two part test

> was designed to widen the ambit of attempt liability, consistent with the drafters' belief that the proper concern of the law of attempts is the dangerousness of the actor, as a person manifesting firm disposition to commit the crime, not the dangerousness of his conduct....

*Rovetuso*, 768 F.2d at 821 n. 12, *quoting, United States v. Ivic*, 700 F.2d 51, 66 (2d

---

9. It is of course well established that a defendant may be convicted of conspiracy even if the object of the conspiracy is unattainable. *See, e.g., United States v. Giordano*, 693 F.2d 245, 249 (2d Cir.1982) (defendant guilty of conspiring to

commit arson where he had agreed to burn a fictitious store). The agreement itself is punishable because of its danger to society, regardless of whether crime itself was or could have been committed. *Id.*

Cir.1983). The government has plainly proved both of the attempt elements beyond a reasonable doubt.

## IV.

■ Count III of the indictment charged Podolsky with possession of an unregistered firearm, in violation of 26 U.S.C. § 5861(d). The government's theory is that the gasoline, chlorine and brake fluid constituted components of a "destructive device" as defined in 26 U.S.C. § 5845(f), and thus were subject to the registration requirements of the National Firearms Act. We disagree.

Our analysis, of course, begins with the language of the statute itself. 26 U.S.C. § 5845(a) defines a "firearm" as including a "destructive device." Other types of firearm include weapons such as machine guns, rifles and shotguns. The key provision in dispute, § 5845(f) provides in relevant part:

> (f) Destructive device.—The term "destructive device" means (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellent charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (D) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter, except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term "destructive device" shall not include any device which is nei-

ther designed nor redesigned for use as a weapon.

It is clear that this section applies primarily to military-type ordnance, such as bombs, mines or bazookas. The government contends that the materials in this case fall under subsection (3) as a "combination of parts ... from which a destructive device may be readily assembled." Subsection (3) requires such a crude device to fall within one of the definitions of subsections (1) and (2). Thus, the government essentially argues that the combination of parts would produce an "incendiary ... (A) bomb ... or (F) similar device."

There is no question that crude bombs or materials from which a bomb can be readily assembled [10] fall under § 5845(f). Typically, courts affirm convictions under § 5845 where defendants either had built "molotov cocktails" or were prepared to build them. *See, e.g., United States v. Ross,* 458 F.2d 1144 (5th Cir.1972), *cert. denied,* 409 U.S. 868, 93 S.Ct. 167, 34 L.Ed.2d 118 (1972); *United States v. Tankersley,* 492 F.2d 962 (7th Cir.1974). Similarly, courts have upheld convictions in cases involving homemade dynamite devices. *See United States v. Bubar,* 567 F.2d 192, 200–01 (2d Cir.1977) (dynamite placed under barrel of gasoline), *cert. denied,* 434 U.S. 872, 98 S.Ct. 217, 54 L.Ed.2d 151 (1977); *United States v. Peterson,* 475 F.2d 806, 810–11 (9th Cir.1973) (flare and fuse combined with gunpowder), *cert. denied,* 414 U.S. 846, 94 S.Ct. 111, 38 L.Ed.2d 93 (1973). However, a molotov cocktail is clearly an "incendiary bomb," just as dynamite is an "explosive bomb." The "device" at issue here is not so clearly a "bomb" or "similar device." Hawkins testified that the materials would ignite and burn, but not cause an explosion. *See* Hawkins Transcript at 35. The explosives expert, Mr. Gleason, admitted at trial that no explosion would occur unless a vacuum existed in the building, which was not the case. The

---

10. The fact that the device was unassembled presents no barrier to conviction, so long as a "destructive device" as defined in § 5845(a) could have been "readily assembled" from the component parts. *See, e.g., United States v. Shafer,* 445 F.2d 579, 583 (7th Cir.1971), *cert. denied,* 404 U.S. 986, 92 S.Ct. 448, 30 L.Ed.2d 370 (1971).

question here, then, is not whether the device would have been "destructive" if readily assembled. Surely it would have caused destruction. Rather, we must decide whether "destructive," *as defined by the Act,* includes non-explosive devices of the type in this case.

The legislative history of the Act shows that Congress was primarily concerned with regulating weapons and military ordnance:

> The 'firearms' covered by the Act were referred to in committee hearings, committee reports, and on the floor of Congress as falling into these two classes: 'gangster-type weapons,' and 'destructive devices' described as 'military-type weapons' or 'primarily weapons of war,' having, it was repeatedly said, no appropriate private use. Thus, Senator Hruska, presenting the amended of 'firearm' to the Senate, stated: 'There is universal agreement that rockets, bazookas, anti-tank guns, heavy field artillery, and the like should be strictly controlled, for there are no legitimate sporting uses for these weapons. Since 1934, automatic, such as machine guns and sawed-off rifles and sawed-off shotguns have been effectively regulated. * * * [D]estructive devices would be placed within this regulatory framework.' 114 Cong.Rec. 26896 (1968).

*United States v. Oba,* 448 F.2d 892, 897–98 (9th Cir.1971) (Browning, J., dissenting), *cert. denied,* 405 U.S. 935, 92 S.Ct. 979, 30 L.Ed.2d 811 (1972); *see also United States v. Posnjak,* 457 F.2d 1110, 1114–16 (2d Cir.1972). While the courts have disagreed as to whether this Act applies to non-military "bombs" such as commercial dynamite, *compare Burchfield v. United States,* 544 F.2d 922 (7th Cir.1976), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1602, 31 L.Ed.2d 806 (1977); *Oba, supra; United States v. Morningstar,* 456 F.2d 278 (4th Cir.1972), *cert. denied,* 409 U.S. 896, 93 S.Ct. 135, 34 L.Ed.2d 153 (1972), *with Posnjak, supra; United States v. Schofer,* 310 F.Supp. 1292 (E.D.N.Y.1970), neither these cases nor cases involving "quasi-military" molotov cocktails or dynamite discuss whether the Act applies to a non-military, non-explosive incendiary device of the type we have in this case.

In two cases involving facts somewhat similar to those in this case, Courts have reached divergent results. In *United States v. Ragusa,* 664 F.2d 696 (8th Cir. 1981), *cert. denied,* 457 U.S. 1133, 102 S.Ct. 2958, 73 L.Ed.2d 1349 (1982), the Court upheld a conviction under § 5845(f) where defendants had spread six trash bags, each holding a five-gallon can of gasoline, through a house, and connected the bags with overlapping paper towels. Conceding that the Act was aimed at military-type weapons, the Court found that this crude device constituted an "incendiary bomb" or "similar device" under the Act. 664 F.2d at 700. In contrast, *United States v. Reed,* 726 F.2d 570 (9th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 221, 83 L.Ed.2d 151 (1984), the Court reversed a conviction under § 5845(f) in which the defendants had burned a building by igniting several paper-wrapped beverage cans filled with gasoline. The Court did not discuss whether the cans were "incendiary bombs or similar devices" under the Act.[11] It instead reversed the conviction on the basis of the clause in § 5845(f) that excludes by way of affirmative defense "any device which is neither designed nor redesigned *for use as a weapon*." The Court reasoned that the cans were not used as a weapon and could not be so used, because

---

**11.** The Court did hold that these cans were an "explosive" under 18 U.S.C. § 844(j), as then enacted. 726 F.2d at 574. *See also United States v. Xheka,* 704 F.2d 974, 978–79 (7th Cir. 1983) (gasoline-soaked paper towels and fumes are an "explosive" under § 844(j) where actual explosion occurred), *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983). We need not decide whether, as Podolsky contends,

§ 844(j) is much broader than § 5845(f) with regard to the definition of explosive (§ 844(j) as currently amended or plainly includes Podolsky's device as an "incendiary"). Even if the definitions of "explosive" are the same, the evidence in this case is that the device would have caused a fire, but not an explosion. Thus, neither *Xheka* nor the first part of *Reed* bear directly on this case.

it would have been difficult and dangerous for a person to hold such a can, ignite the paper and then successfully use or throw the can without serious harm. Nothing in the record indicates that a device of this kind, although capable of causing great incendiary damage, bears the traditional indicia of a weapon, or had such a possible use.

726 F.2d at 576.

Even under the approach of the *Ragusa* case, the alleged device in this case is not an "incendiary bomb" or "similar device" requiring registration under the Act. In *Ragusa*, the Court found that the device there would explode, and therefore was similar to a crude bomb. 664 F.2d at 699–70. In contrast, the device here would ignite and cause a fire but not explode. In no way can it be thought of as an "incendiary *bomb*" or "similar device" under any traditional definition of the words.[12] The Courts, like *Ragusa*, have construed § 5845(f) broadly beyond the military sphere, but none that we know of have stretched the statute so far as to cover component parts of an incendiary device that is not a bomb or similar to a bomb.[13] Accordingly, following the maxim that criminal statutes must be construed narrowly, *see, e.g., Liparota v. United States*, — U.S. —, 105 S.Ct. 2084, 1089, 85 L.Ed.2d 434 (1985), we hold that the device in this case falls outside the statutory definition of "destructive device" and was not subject to the registration requirements of the Act. In light of this holding, we need not decide whether the *Reed* analysis applies, such that the device also falls within the statutory exclusion for devices not designed for use as a weapon. Nor need we reach Podolsky's other arguments.

V.

For the foregoing reasons, the defendant's motion of judgment of acquittal is granted with respect to Count III and to Count I to the extent it alleges a conspiracy to possess an unregistered firearm. In all other respects, his motion is denied. The defendant is found guilty beyond a reasonable doubt as to Counts I and II. It is so ordered.

---

**12.** The *Ragusa* court relied on the dictionary's definition of "bomb," which is "an explosive, incendiary, or gas filled container for dropping, hurling, or setting in place *to be exploded* by a timing mechanism." 664 F.2d at 699. Podolsky's device, which would not have exploded, does not fall within this or any other conception of what a "bomb" is.

**13.** We reject the government's attempt to rewrite the statute by deleting the word "bomb" from it. It argued that the provision covers " 'any … incendiary … or similar device.' "

Government's Response at 19. However, Congress stuck the word "bomb" in the statute, and we think that in so doing it intended to restrict the breadth of the class of destructive devices. "Incendiary," as it appears in the statute, is not a noun. It is an adjective modifying the noun "bomb." If Congress intended to cover any dangerous incendiary, it could have done so, as it did in the recently amended § 844(j). But it did not do so, and, until it does, we must read the word "bomb" so that it retains some sensible meaning.