**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Nobuo KIRIKI, Defendant-Appellant.**

No. 83–1246.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 14, 1984.

Decided April 5, 1985.

Frank J. Marine, Washington, D.C., for plaintiff-appellee.

Michael Levine, Honolulu, Hawaii, for defendant-appellant.

Before FAIRCHILD, Senior Circuit Judge,* and GOODWIN and BOOCHEVER, Circuit Judges.

* Honorable Thomas E. Fairchild, Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit, sitting by designation.

FAIRCHILD, Senior Circuit Judge:

Defendant-appellant Nobuo Kiriki appeals from his sentence following conviction by a jury of conspiring to transport stolen property of a value of $5,000 or more in foreign commerce in violation of 18 U.S.C. § 2314 and to export, by means of smuggling, firearms designated on the United States Munitions List (22 C.F.R. § 121.01) to Japan without a license in violation of 22 U.S.C. § 2778 and the regulations issued thereunder (22 C.F.R. §§ 121.-01 et seq.), all in violation of 18 U.S.C. § 371. We affirm.

The indictment charged that Nobuo Kiriki, Henry Matsumoto [1] and others unknown conspired to commit the stolen jewelry and firearm smuggling offenses. It charged twelve overt acts in furtherance. Most of these were telephone calls and other conversations with an undercover police officer (identified at trial as Alan Anami of the Honolulu Police). These conversations occurred from January 2 to 16, 1980.

The case was submitted to the jury on a carefully drawn special verdict. By its answers, the jury found that each defendant had conspired to transport stolen jewelry and to smuggle firearms as charged. The jury specified nine overt acts which it found had been committed.

Except for admissions of Matsumoto, redacted so as to incriminate only himself and inadmissible against Kiriki, the evidence consisted of the testimony of Anami, the undercover police officer, concerning his conversations with defendants, and tape recordings of many of them. The Government's theory, consistent with the allegations in the indictment, was that the January conversations, in which defendants negotiated for Anami's furnishing jewelry and firearms, and smuggling the latter, constituted evidence from which a conspiracy between defendants could be inferred, as well as overt acts to carry out its objects.

**FACTS**

Anami met defendant Henry Matsumoto in August of 1979. Another undercover police officer pretended to sell stolen jewelry and camera equipment to Anami in Matsumoto's presence. Anami paid $240 for the merchandise which was worth $2,000. Matsumoto asked Anami why he had paid only $240. Anami told him the merchandise was stolen and that he came into stolen jewelry all the time. Matsumoto then offered to sell such stolen jewelry for Anami. Matsumoto also said that he and a friend were looking for guns and if Anami should come into .38's, .45's or .357's, Matsumoto would be interested in buying them.

Almost five months later, on January 2 and 3, 1980, Matsumoto called Anami's message service and left messages for Anami to call him. On January 3 Anami returned the calls. Matsumoto told Anami he and a friend were interested in buying some jewelry to be sold to Japanese citizens going back to Japan. They arranged to meet later that day.

Anami met Matsumoto at 5:00 PM January 3 at Nevada Bob's Discount Golf Shop (Nevada Bob's) where Kiriki and Matsumoto both worked. In a tape recorded conversation Matsumoto told Anami that some people were interested in 100 magnum firearms being delivered to Japan and diamonds, emeralds and rubies to take back to Japan where they would "unload" the merchandise. Matsumoto indicated that his "customers" would be in town until the 6th, had unloaded stuff before and would be back every three months to buy such jewelry. Anami said he could obtain such merchandise, the price would be from fifteen to twenty-five percent of retail and it would be "super hot." Matsumoto replied "thats why they buying 'em ... they know its goin' be hot."

Kiriki joined Anami and Matsumoto during the course of this conversation. Matsu-

---

**1.** Henry Matsumoto was jointly tried and convicted with appellant. He has not appealed from that conviction.

moto advised Kiriki that Anami would be able to obtain stolen jewelry. Anami discussed the need in obtaining an appraisal to go to a jeweler they could trust not to identify the jewelry as stolen. Matsumoto also stated that he had some friends who wanted to buy one hundred .357 magnums to be delivered to Japan. The three arranged to discuss these matters further the next day.

On January 4, 1980, in an unrecorded telephone conversation, Anami told Kiriki that he had some stolen jewelry to show him. Later that same day Anami met Kiriki at Nevada Bob's. Their conversation was tape recorded. Anami showed Kiriki some jewelry and gemstones, indicating he was unable to obtain any diamonds. Anami told Kiriki the merchandise was stolen and couldn't be taken to an unknown jeweler to be checked because it might be recognized. Kiriki indicated that he understood. Kiriki told Anami that the jewelry he brought would be too hard to sell; he was interested in more expensive stones, diamonds and emeralds, valued at $5,000 or higher.

Kiriki also told Anami at this meeting that he needed 100 magnum handguns. Anami replied that he would discuss the matter with his contact, and Kiriki said he would talk to Matsumoto the next day.

On January 14 Officer Anami made two recorded telephone calls to Nevada Bob's. In the first he talked with Kiriki and said he had something to show him. Kiriki asked him to come to Nevada Bob's but Anami declined and said he would call back later. In the second call, Kiriki answered and put Matsumoto on the telephone. Anami and Matsumoto arranged to meet so Matsumoto could examine some firearms.

On January 15 Officer Anami met Matsumoto at the Beretania Saimin Restaurant. The meeting was audio and video recorded. Anami told Matsumoto that he had forty to fifty magnum caliber handguns, forty .25 caliber semi-automatic firearms and .38 caliber revolvers for sale. Anami told Matsumoto that if they could handle the forty .25 caliber guns his boss would give them a crack at the .38's. Matsumoto said he was primarily interested in .357 magnum handguns because the buyers in Japan wanted guns that could penetrate bullet proof vests.

Anami told Matsumoto that the .25 caliber semi-automatic handguns would cost $200 each if delivered in Honolulu and $500 each if delivered to Japan. Anami added that he would need $3,000 to bribe a Customs official in Japan, and that one-half the purchase price and bribe money would be paid before the guns left Honolulu and the remainder paid when the guns were successfully smuggled into Japan. Anami told Matsumoto that the serial numbers on the firearms would be removed in Japan and he would package the firearms to conceal them.

Anami and Matsumoto left the restaurant and walked to Anami's car where Anami showed Matsumoto ten .25 caliber Raven semi-automatic handguns, the same type as the 40 firearms that Anami told Matsumoto he would deliver to Japan. Matsumoto indicated he would talk to Kiriki and then give Anami a call.

Later that same day Anami telephoned Nevada Bob's and spoke to Matsumoto. Matsumoto told Anami he was waiting to hear from his people as to whether they wanted the guns delivered in Honolulu or smuggled to Japan. Anami called back later and Matsumoto told him they wanted the second way, i.e., smuggled to Japan and they had agreed to Anami's terms. Matsumoto arranged to meet Anami the next day.

On January 16, 1980 Officer Anami met Matsumoto at the Bakery Kapiolani Restaurant. The meeting was audio and video recorded. Matsumoto told Anami that his people were going to buy the guns, but that they wanted someone from Japan to come to Honolulu, see the guns, make the payment and accompany Anami to Japan to deliver the firearms. They then discussed in greater detail the previously outlined terms of the transaction for the .25 caliber firearms.

Matsumoto and Anami talked about Kiriki as a part of this deal, mentioned that Kiriki was going to negotiate the next deal himself and that the cut would be greater on that deal and that Kiriki would give Matsumoto his cut of this deal. Matsumoto indicated that "they" were going through with this deal in order to make a second deal to purchase .357 magnums. He indicated that the first purchase (of the .25 semi-automatics) was a "goodwill buy."

Later that same day Anami telephoned Nevada Bob's. In a taped conversation, Matsumoto stated that he told Kiriki the terms of the agreement. The three of them arranged to meet later at the Village Inn Restaurant.

Before the Village Inn meeting, Anami testified that he again spoke to Matsumoto in an unrecorded telephone conversation. Matsumoto told Anami that his Japanese associates were short of the full purchase price for the semi-automatic firearms. Matsumoto added that the firearms were to be used by a "family organization" in Japan, and Kiriki was attempting to contact another family organization in Osaka, Japan to sell them the .25 caliber handguns.

The Village Inn meeting was audio and video recorded. Anami reiterated the terms of the .25 caliber firearm sale. Kiriki indicated that he understood and agreed to the terms for the delivery of the .25 caliber firearms to Japan. Matsumoto and Kiriki told Anami they were interested in magnum caliber firearms and asked about the price. Anami said he would call the next day with the price.

Kiriki cautioned Anami "they no trust you." Kiriki told Anami that people had gotten caught smuggling guns into Japan and every time the guns were confiscated by Customs. Anami said he was able to smuggle the guns by bribing Customs officials and it was being done daily.

On January 17 Officer Anami had two recorded telephone conversations with Matsumoto. In the first Anami told Matsumoto that 100 magnum firearms would cost $750 each. Matsumoto said Kiriki would

call Japan later and Matsumoto would call Anami back "either way." In the second conversation Anami said he would need $3,000 more "grease money" in addition to the $750 per magnum to smuggle the guns into Japan. Matsumoto told Anami that their associates in Japan "think something fishy ... because they no can buy anybody over thea."

On January 21 Anami met Kiriki at Nevada Bob's; the meeting was tape recorded. Kiriki told Anami that his friend in Tokyo was in Hong Kong and he did not know when he would hear from him. He explained that Anami had not heard from Matsumoto because he had been sick. Kiriki told Anami to leave a number and he would call him when he heard from his associates in Japan. Anami did not have any other conversations with Kiriki or Matsumoto.

In addition to the tapes of the above meetings and telephone conversations Matsumoto's written confession and grand jury testimony, redacted to omit reference to Kiriki, were admitted into evidence against Matsumoto.

The defendants offered into evidence the transcripts of Officer Anami's recorded conversations with the defendants and rested without presenting any other evidence.

Based on the above evidence the jury, by means of a special verdict, found both defendants guilty of knowingly conspiring to transport stolen property in foreign commerce and knowingly conspiring and agreeing to export, by means of smuggling, firearms to Japan. The overt acts found by the jury were: Matsumoto's January 2 telephone call to reach Anami; his January 3 conversation with Anami concerning stolen jewelry and 100 magnum revolvers; his January 3 introduction of Kiriki to Anami; his January 3 telephone call to reach Anami; Kiriki's January 4 meeting with Anami; Kiriki's January 4 conversation with Anami about purchasing jewelry and magnum revolvers; Matsumoto's January 15 meeting with Anami to inspect .25 caliber handguns; Matsumoto's January 15 conversation with

Anami about the ultimate purchaser of the firearms in Japan and his willingness to pay; and Matsumoto's and Kiriki's January 16 meeting with Anami to discuss the smuggling of firearms.

ANALYSIS

Appellant contends that the evidence was insufficient to establish an agreement between Kiriki and Matsumoto to accomplish an unlawful objective and to establish that Kiriki had the requisite intent to commit the substantive offenses which were the object of the conspiracy. Appellant also argues that the Government failed to present any evidence of an overt act in furtherance of the conspiracy because the overt acts alleged in the indictment and found by the jury were actually part of the act of agreeing. He contends that the agreement by which the defendants entered the conspiracy cannot also serve as the overt act. *See United States v. Sarno,* 456 F.2d 875, 877–78 (1st Cir.1972).

▇▇▇ In determining the sufficiency of the evidence, the appropriate standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Becker,* 720 F.2d 1033, 1035 (9th Cir.1983). The essential elements of conspiracy are "an agreement to accomplish an illegal objective, coupled with one or more overt acts in furtherance of the illegal purpose and the requisite intent necessary to commit the underlying substantive offense." *United States v. Sangmeister,* 685 F.2d 1124, 1126 (9th Cir.1982); *United States v. Becker,* 720 F.2d at 1035. The agreement need not be explicit, but may be inferred from circumstantial evidence. *United States v. Melchor-Lopez,* 627 F.2d 886, 891 (9th Cir.1980). Inferences of the existence of such an agreement may be drawn "if there be concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose." *United*

*States v. Monroe,* 552 F.2d 860, 862–63 (9th Cir.), *cert. denied,* 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1069 (1977); *United States v. Melchor-Lopez,* 627 F.2d at 890.

Appellant contends that the evidence was insufficient to establish beyond a reasonable doubt that an agreement to commit an offense was reached between Kiriki and Matsumoto. He apparently believes that there could be no conspiracy until Anami joined in the agreement, and argues that the conversations show that Anami, Kiriki and Matsumoto merely entered into preliminary discussions with regard to buying stolen jewelry and smuggling firearms and no meeting of the minds ever occurred.

The Government contends that the agreement was one between Kiriki and Matsumoto to acquire stolen jewelry and firearms for delivery to Japan and having reached that agreement the defendants elicited Anami's assistance as a supplier and smuggler (and additional conspirator). The Government argues that any alleged lack of agreement between Anami and the defendants is irrelevant because the issue is whether the evidence showed an illegal agreement between Kiriki and Matsumoto.

The special verdict and the nine overt acts found by the jury, the various phone calls and meetings between Anami and Kiriki and Matsumoto, make it clear that the jury found that Kiriki and Matsumoto agreed between themselves to commit the offenses and their dealings with Anami, which never came to fruition, were attempts to implement their agreement.

▇▇▇ Appellant argues that Matsumoto and Kiriki shared merely a general intent to engage in the purchase of stolen jewelry but came to no meeting of the minds concerning such purchase because there was no specific agreement with Anami as to the type, quantity or price of jewelry that Kiriki might buy or any discussion as to the time, place or mode of delivery of such jewelry. However, it appears from the evidence that Kiriki and Matsumoto did have at least some of those specifics worked out in their agreement to traffic in stolen jew-

elry and were looking to Anami to supply those specifics, *i.e.*, diamonds, rubies and emeralds valued at $5,000 or more, for a price of 15 to 25 percent of retail. In addition, it appears that Kiriki and Matsumoto already had purchasers in mind who would know they were buying stolen merchandise and who were prepared to take the jewelry to Japan to sell it. The fact that the intermediate step, purchasing such jewelry from Anami, was never accomplished does not disprove the existence of the underlying agreement between Kiriki and Matsumoto. There was sufficient evidence for the jury to conclude that Kiriki and Matsumoto had agreed to purchase stolen jewelry to export to Japan.

■ Appellant makes a similar argument with respect to the purchase of firearms. This argument can be similarly answered. Even if the negotiations with Anami were not shown to have resulted in an agreement among all three men concerning the purchase of weapons, the method of smuggling and the terms of payment, the jury could reasonably infer that the repeated conversations and meetings shown by the evidence must have meant that Kiriki and Matsumoto had agreed between themselves to obtain the guns and have them smuggled to Japan.

It happens that the negotiations could be found to have produced agreement with Anami on many aspects of the gun transactions. Although Kiriki and Matsumoto were primarily interested in magnums, it is fair to say that they did reach agreement with Anami as to the terms of purchase of the .25 caliber automatics, and by the time of the Village Inn meeting on January 16, there was agreement on the plan proposed by Anami for the smuggling operation. If we were to focus solely on the agreement with Anami as the conspiracy, appellant might well make his point that there was no overt act in addition to the agreement charged and proved. We think the conviction must rest upon the existence of an agreement between Kiriki and Matsumoto which they unsuccessfully attempted to im-

plement through Anami, but we conclude that it properly can so rest.

■ Appellant argues that the defendants' apparent failure to attempt to carry out any plan in the four years since their negotiations with Anami is compelling evidence that no agreement existed and that appellant lacked the requisite intent to carry out the substantive offenses. Failure to carry out the conspiracy does not preclude its existence. *United States v. Kearney,* 560 F.2d 1358, 1367 (9th Cir.), *cert. denied* 434 U.S. 971, 98 S.Ct. 522, 54 L.Ed.2d 460 (1977) ("Ultimate consummation of the scheme is not essential to completing the crime of conspiracy."). Moreover, it appears from the evidence that the jury could have reasonably concluded that the conspirators suspected something was "fishy," *i.e.*, Anami was a police informant, and therefore aborted the smuggling plan.

The evidence, when viewed in the light most favorable to the Government, was sufficient to establish that Kiriki had the requisite intent to commit the substantive offenses and to show a "meeting of the minds" between Kiriki and Matsumoto to obtain stolen jewelry for export and cause firearms to be smuggled to Japan.

Appellant relies heavily on this court's decision in *United States v. Melchor-Lopez,* 627 F.2d 886, to support his contention that no "meeting of the minds" occurred in the present case. In *Melchor-Lopez* two defendants, Melchor-Lopez and Kommatas, were convicted of conspiring to import heroin and cocaine, and conspiring to possess, with intent to distribute, heroin and cocaine. The key figure in the alleged conspiracy was Salvatore Rina, an indicted co-conspirator, who sought to act as an intermediary in bringing together Melchor-Lopez as a supplier of heroin and cocaine and Kommatas as purchaser. Although Rina met separately with Melchor-Lopez and Kommatas in laying the groundwork, Melchor-Lopez and Kommatas never dealt directly with each other, nor reached agreement individually with Rina.

The Government contended that an agreement had been reached between Rina

and Melchor-Lopez at a meeting of Rina, Melchor-Lopez and Frank Noriega, a paid Government informant, where Rina indicated his desire to buy heroin and Melchor-Lopez offered to sell heroin provided certain pre-conditions were met. The pre-conditions were never met and Melchor-Lopez "steadfastly refused to agree to any such transaction." 627 F.2d at 889. Agent Noriega's report of this meeting concluded: " 'Rina and Melchor did not reach an agreement.' " 627 F.2d at 891.

The evidence as to Kommatas showed that he met with Rina and discussed heroin pricing mechanisms and the methods of transacting a sale but never agreed to buy any heroin in any specific amount or for a specific price.

This court found insufficient evidence of a meeting of the minds between Rina and Melchor-Lopez or between Rina and Kommatas.

In contrast here, the two defendants worked together to elicit Anami's assistance in acquiring stolen jewelry which their associates would take to Japan and in arranging for acquisition and smuggling of firearms. The evidence supported a finding that they agreed between themselves to carry on illegal activity. The extent of their negotiations with Anami was a sufficient basis for "any rational trier of fact" to find an agreement between Kiriki and Matsumoto to engage in an illegal act.

Appellant also argues that the Government failed to present any evidence of an overt act in furtherance of the conspiracy because the overt acts alleged in the indictment and found by the jury were actually part of the act of agreeing. He contends that the agreement by which the appellant entered the conspiracy cannot also be the overt act. *United States v. Sarno*, 456 F.2d 875, 877–78 (1st Cir.1972).

This argument presupposes that there could be no conspiratorial agreement until Anami became a party to it. If that were true, there would be at least some doubt whether the Government pleaded and proved an overt act in addition to the formation of the agreement. However, the evidence supports the Government's theory that Kiriki and Matsumoto agreed between themselves to traffic in stolen property and firearms and then contacted Anami in an effort to implement their agreed upon plan. Thus the overt acts alleged in the indictment, the various phone calls and meetings between the conspirators and Anami, were subsequent and in addition to the formation of the alleged agreement. It is evident from the transcript, the form of the special verdict and the answers made by the jury that the case was tried and determined on this theory.[2]

We AFFIRM.

---

2. In his principal brief appellant apparently alleges that the district court erred in refusing his proffered instructions on the overt act requirement. We find the district court's instructions adequately charged the jury on the overt act requirement. The refusal to give a requested instruction is not error " 'if the charge as a whole adequately covers the theory of the defense.' " *United States v. Bradshaw*, 690 F.2d 704, 710 (9th Cir.1982), *cert. denied* — U.S. ——, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983), *quoting United States v. Kaplan*, 554 F.2d 958, 968 (9th Cir.), *cert. denied*, 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977), *reh'g denied*, 434 U.S. 1026, 98 S.Ct. 755, 54 L.Ed.2d 774 (1978).