**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Robert B. PEMBERTON, Jr.,**
**Defendant-Appellant.**

**No. 87–1060.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 8, 1987.

Decided Aug. 3, 1988.

---

Michael H. Metzger, Sausalito, Cal., for defendant-appellant.

John Stephen Graham, and Dorothy Nash Holmes, Asst. U.S. Attys., San Francisco, Cal., for plaintiff-appellee.

Before SKOPIL, NELSON and BEEZER,* Circuit Judges.

PER CURIAM:

Robert Pemberton appeals his conviction on one count of conspiracy to possess more than 50 kilos of marijuana for sale and on three counts of using a phone to facilitate a narcotics offense. *See* 21 U.S.C. §§ 846 and 843(b) (1982). He argues that there was insufficient evidence to convict him of conspiracy, that the district judge erred in instructing the jury, and that his conviction should be void because of alleged outrageous conduct on the part of the government. We conclude that sufficient evidence existed for the jury to find Pember-

---

* Judge Beezer was drawn to replace Judge Kennedy. He has read the briefs, reviewed the record and listened to the tape or oral argument held on October 8, 1987.

ton participated in a conspiracy, that the jury instructions fairly stated the law and did not prejudice Pemberton's case, and that the government's conduct was not outrageous. Therefore, we affirm.

## I

A government undercover operative, Bob Clark, was investigating a money-laundering scheme. He had told a third party, Sunny Collins, that he was planning to smuggle a shipment of marijuana into the United States. The shipment was a fiction. Sunny Collins arranged for Clark to meet with appellant Pemberton, who the government suspected to be a long-time drug dealer involved in the laundering operation. On June 5, 1986 Clark and Pemberton met at a restaurant to discuss a possible venture to import marijuana into northern California. They compared stories of their exploits in the drug trade, including their previous incarcerations in Mexico on drug charges. Later, it was Pemberton who first broached the subject of Clark's bringing in a load of marijuana.

After dinner Clark and Pemberton went to Pemberton's residence where they spent the next several hours discussing drug activities in general, their previous smuggling experiences, and Pemberton's participation with Clark in selling and distributing the fictional marijuana. Clark indicated he would need someone's assistance in the operation, and Pemberton indicated he was willing to supply "soldiers and trucks" and that he "had a few stash spots that were available that he had used before that were secure, and he definitely had a market that this marijuana could be entered into." The discussions then became more specific with respect to Pemberton's involvement. In exchange for one-third of the profits, Pemberton suggested, he could put together personnel, trucking, storage, and a market for the marijuana.

In the following days Pemberton sought out William Guinn as a potential ally in the storage and sale of the marijuana. Guinn expressed interest. In response to Pemberton's request for help in storing the drugs, Guinn agreed to check out potential storage places. He concluded that a large garage on his own property would suffice. Guinn then purchased garbage bags, smaller plastic baggies, and $2 \times 12$ pieces of lumber; he assembled tables in the garage and brought in scales for use in weighing, inspecting, and grading the marijuana.

Intermittent meetings and phone calls among the parties established that they were ready to receive the marijuana. On July 9, 1986 Clark and Pemberton met at a hotel, then drove to a shopping center where U.S. Customs agents had loaded a motor home with previously seized marijuana. Pemberton inspected the marijuana, and the parties discussed its quality and the likely profits it would bring. Clark requested "front money" from Pemberton to pay his "crew," but Pemberton said he could not get any cash until the drugs were sold. The understanding to that point had been that Clark would place the marijuana with Pemberton and Guinn on credit.

Pemberton left and went to meet with Guinn. They went to a nearby bar, where they received a phone call from Clark. Pemberton argued with Clark over the front money and made an arrangement to meet at Guinn's residence. Clark did not show. The last contact between the parties was a telephone conversation on July 13, 1986, in which Clark stated he had lost half his load, and Pemberton responded that he no longer wanted a part in the deal.

## II

Pemberton argues that there was insufficient evidence to convict him of conspiracy. He contends that Clark as a government informant could not be a co-conspirator, and that there never was an agreement between Pemberton and Guinn sufficient to form a conspiracy. Pemberton argues that Guinn testified he would not agree to help store and sell the marijuana until he saw and tested it. The government counters that Guinn had agreed to participate, that he had made all the preparations to store the marijuana, and that he merely wanted to examine the drugs to determine how much they would bring upon sale.

■ We will uphold a conviction if the evidence, when viewed in the light most favorable to the government, would support a finding by any rational trier of fact that the defendant was guilty of each essential element of the crime charged. *United States v. Penagos*, 823 F.2d 346, 347 (9th Cir.1987). The elements of conspiracy are 1) an agreement to accomplish an illegal objective, 2) coupled with one or more acts in furtherance of the illegal purpose, and 3) the requisite intent necessary to commit the underlying substantive offense. *United States v. Indelicato*, 800 F.2d 1482, 1483 (9th Cir.1986). The agreement need not be explicit, and it may be inferred from circumstantial evidence. *See United States v. Thomas*, 586 F.2d 123, 132 (9th Cir.1978).

Contesting the existence of an agreement between him and Guinn, Pemberton places great reliance on *United States v. Melchor-Lopez*, 627 F.2d 886 (9th Cir.1980). In that case we reversed convictions on the ground that appellants had agreed only to negotiate about a purchase, not to make a purchase. 627 F.2d at 892. Pemberton likens this case to *Melchor-Lopez* by asserting that Guinn would not agree to take part in the operation until he had inspected the marijuana.

The government relies on two more recent cases, *United States v. Sharif*, 817 F.2d 1375 (9th Cir.1987), and *United States v. Kiriki*, 756 F.2d 1449 (9th Cir.1985), to argue that preparations for carrying out the conspiracy are sufficient to show the agreement. The appellant in *Sharif*, like Pemberton here, relied heavily on *Melchor-Lopez*. We distinguished *Melchor-Lopez* as follows:

> The defendant extrapolates from this case a general rule that as a matter of law there can be no conspiracy without proof of an agreement not merely to carry out an illegal objective but also on such terms as price, quantity, and time, place, and manner of delivery. Our decisions, however, do not create such a requirement, for we have held proof of conspiracy sufficient where the actual buyer and seller never agreed to such terms. We have recognized the exist-

ence of a conspiracy between intermediaries where the principal was a government agent and the contemplated transaction never transpired. In this light, *Melchor-Lopez* must be examined with some care.

817 F.2d at 1378 (citations omitted). In *Kiriki* the appellant argued along the same lines. Finding that an agreement did exist, we stated that the parties "did have at least some of those specifics worked out in their agreement to traffic in stolen jewelry, ... and purchasers in mind who would know they were buying stolen merchandise and who were prepared to take the jewelry to Japan and sell it." 756 F.2d at 1453–54.

■ Like the parties in *Sharif* and *Kiriki*, Pemberton and Guinn had worked out specifics, such as where to store and package the marijuana, and had purchasers in mind. Although Guinn did testify that he wanted to inspect the marijuana, the government's explanation that this was only to estimate what the drugs would bring upon final sale supports a jury finding that Guinn was in the conspiracy proper: after all, Guinn, in preparing to receive the marijuana, already had set up a processing plant in his garage. In *Melchor-Lopez*, by contrast, the appellant had "firmly refused to commit himself" to participate in the conspiracy until money for the drugs was delivered in advance, which did not occur. 627 F.2d at 891.

Considered in the light most favorable to the prosecution, the evidence would support any rational juror in finding that Guinn already had made up his mind to take part in the conspiracy, that he had done so believing the "stuff" would not be "garbage" based on his prior drug relationships with Pemberton, and that he only wished to inspect the drugs to get a feel for their value. Pemberton and Guinn entered into an agreement and hence into the conspiracy.

### III

Pemberton next argues error in the conspiracy charge as submitted and error in that the charge submitted deviated from

the one discussed in conference. Both arguments stem from the way the district judge phrased one sentence in the jury instruction. The judge charged the jury to consider "were they in agreement that, *if the circumstances properly presented themselves*, they would commit a criminal offense" (emphasis on added phrase). Pemberton claims he believed the judge would give an instruction that there had to be an "actual agreement to commit a criminal act." He contends not only that the added phrase resulted in an inaccurate statement of the law, but that the deviation undermined his defense. He argues prejudice from the instruction because he had presented a "morally guilty, but legally innocent" defense; according to Pemberton, the added phrase would cause the jury to convict for bad character even in the absence of an agreement.

Fed.R.Crim.P. 30 states:

[A]ny party may file written requests that the court instruct the jury on the law as set forth in the requests.... The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury.

In *Wright v. United States*, 339 F.2d 578, 580 (9th Cir.1964) (source omitted), we observed, "The obvious object of the rule in point is to require the judge to inform the trial lawyers in a fair way what the charge is going to be, so that they may intelligently argue the case to the jury." Later, in *United States v. Harvill*, 501 F.2d 295, 296–97 (9th Cir.1974) (per curiam), we stated that "the court's failure to advise Harvill's counsel that he would not give the requested instructions requires reversal of the conviction only if counsel's closing argument was prejudicially affected thereby." In both *Wright* and *Harvill* a requested instruction was entirely omitted, which is not the case here. Pemberton simply objects to a nuance put on the instruction, claiming the nuance was enough to alter the law as told to the jury and to prejudice his closing argument.

 Whether a jury instruction correctly defines the elements of the offense in question is a question of law that we review de novo. *United States v. Stenberg*, 803 F.2d 422, 433 (9th Cir.1986). A conviction will not be reversed because of an allegedly false instruction as long as the instruction, when viewed as a whole in the context of the entire trial, fairly and adequately covers the issues in the case. *United States v. Marabelles*, 724 F.2d 1374, 1382–83 (9th Cir.1984).

 Viewed as a whole, the jury instruction fairly and adequately covers the conspiracy issues in this case. The judge carefully set out all elements of conspiracy. Indeed, the judge began his instruction on agreement by stating Pemberton's theory in Pemberton's own words:

Proof of mere negotiations between the defendant and someone isn't sufficient to support a conspiracy conviction, even though those negotiations clearly prove the defendant's intention or strong desire to engage in criminal conduct, because the crime of conspiracy is made out only when the alleged coconspirators actually come to some agreement or understanding between themselves that they will commit a criminal act.

Pemberton challenges a later statement— "if the circumstances properly presented themselves, they would commit a criminal act"—that aimed to define more precisely the element of agreement between conspirators. As the statement itself suggests, the judge sought to make clear that the ultimate objective of the conspiracy need not be accomplished for the crime of conspiracy to be complete. *See Sharif*, 817 F.2d at 1378; *United States v. Croxton*, 482 F.2d 231, 233 (9th Cir.1973). The judge's next statements confirm that he did not charge the jury to equate bad character with an agreement:

But, as I say, you must be satisfied that there was an agreement of the minds, a union of the minds, between the conspirators as to what the plan was, what the objectives of it were, what each of them was to do in seeking to accomplish the plan.

As this quote illustrates, the instruction, viewed as a whole, fully and fairly presents the applicable law.

Where the challenge is only to language in the instruction, we will reverse the district court only when it has abused its discretion. *Marabelles,* 724 F.2d at 1383. Pemberton argues that the language "if the circumstances properly presented themselves" prejudiced his closing argument. We have held that prejudice may justify reversal. *See United States v. McCown,* 711 F.2d 1441, 1452 (9th Cir.1983) (citing *Harvill,* 501 F.2d at 296–97, and *United States v. Wycoff,* 545 F.2d 679, 683 (9th Cir.1976), *cert. denied,* 429 U.S. 1105, 97 S.Ct. 1135, 51 L.Ed.2d 556 (1977)). Those cases, however, typically involve an instruction counsel relied on that the judge did not give, or one the judge gave that counsel did not expect. In *United States v. Gaskins,* 849 F.2d 454 (9th Cir.1988), for instance, the judge gave a new instruction on aiding and abetting after defense counsel had tailored closing argument to the theory that defendant was not a principal participant. Beforehand the judge had agreed not to give the aiding and abetting instruction; afterwards he did not allow defense counsel to reopen closing argument.

Unlike in *Gaskins,* in this case the judge did not introduce a new theory by means of an alternative instruction; Pemberton was not prejudiced. Instead, in the course of giving all of defense counsel's proposed instruction, the judge added one short phrase that was, at worst, ambiguous. This was not abuse of discretion. In the context of the entire instruction given, we hold not only that the instruction was substantively correct, but that the one challenged phrase did not render the instruction misleading or inadequate to guide the jury. *Compare United States v. Washington,* 819 F.2d 221, 226 (9th Cir.1987); *United States v. Pazsint,* 703 F.2d 420, 424 (9th Cir.1983).

## IV

As a final challenge, Pemberton argues that the government engaged in conduct so outrageous as to constitute a deprivation of due process that would bar the prosecution. Pemberton claims that because the government originally sought to involve him in this smuggling operation to further their investigation of the money laundering scheme, there was no proof of an ongoing criminal activity of his for the "sting" to infiltrate. He argues that he was retired from the drug business and that the government had to set up this deal to convict him.

The "outrageous conduct" defense derives from *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). We have said it may apply "when the government's conduct is so grossly shocking and so outrageous as to violate the universal sense of justice." *United States v. Ramirez,* 710 F.2d 535, 539 (9th Cir.1983) (quoting *United States v. Ryan,* 548 F.2d 782, 789 (9th Cir.1976), *cert. denied,* 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977)). More recently, we have analyzed when the defense might be appropriate. *See United States v. Bogart,* 783 F.2d 1428 (9th Cir.1986) (vacated and remanded as to defendant Wingender; *see United States v. Wingender,* 790 F.2d 802 (9th Cir.1986)). In *Bogart* we observed, "In each of the cases in which an outrageous conduct defense has succeeded, the government essentially manufactured the crime." 783 F.2d at 1436. Or, as we stated in *Ramirez,* "government agents engineer[ed] and direct[ed] the criminal enterprise from start to finish." 710 F.2d at 539.

The only Ninth Circuit case barring prosecution for outrageous conduct is *Green v. United States,* 454 F.2d 783 (9th Cir.1972). In that case the government contacted suspected bootleggers and supplied them with materials, an operator for the still, and sugar at wholesale price. Most important, the government also purchased the still's product. As the court put it, a government agent "was the only customer of the illegal operation he had helped to create." 454 F.2d at 787. *Greene* was truly an instance in which "government agents engineer[ed] ... the criminal enterprise from start to finish." *Ramirez,* 710 F.2d at 539.

Pemberton's situation is not like that in *Greene.* Instead, his situation is more like that in *United States v. Wiley,* 794 F.2d

514 (9th Cir.1986). In *Wiley* we upheld an indictment against a charge of outrageous conduct. There we directly faced the question whether the government engineered the activity, or merely activated it. Using an informant and an FBI agent posing as a courier, the government infiltrated a prison drug smuggling operation. We found that the smuggling network was already in place and that the government merely activated it to find the route and couriers. As the majority explained, "[T]he government merely provided an impetus to [the defendants, and] ... [u]nder these circumstances, providing the drugs for the transaction did not constitute government misconduct." 794 F.2d at 516 (citation omitted).

*United States v. Smith,* 802 F.2d 1119 (9th Cir.1986), likewise permits the government to activate existing drug contacts. In *Smith* we stated:

> Concerning [appellant]'s reputation, the agents understood that while [he] was not using drugs, he still had contacts to acquire them, although the agents were not sure whether he was presently dealing. Such an understanding was not patently unreasonable since [he] admits that he used and dealt drugs in the recent past.

802 F.2d at 1126. As in *Smith,* here we find the evidence sufficient to show that Pemberton was not in fact "retired" from the drug trade but, as the government says, "merely between opportunities."

■ Pemberton cataloged his extensive involvement in drug dealing and admitted he had never earned income from any other source. Throughout Clark's investigation, specific comments by Pemberton indicated present activity in drug dealing. With reference to equipment for packaging marijuana, Pemberton stated, "I've got a vacuum sealer at my disposal." With reference to communications, he stated, "I use pay phones and my beeper. That's how I do business." With reference to a potential marijuana market, he stated, "I got guys from Cincinnati ... I got guys from ... New York ... that are dying to get this."

Far from being an unwitting private citizen coerced into crime by an underhanded government operation, Pemberton is more akin to a practicing businessman who leaped at the chance to engage in another illicit transaction. He had a network of men, contacts, and supplies ready for use in the venture. Pemberton was to have primary responsibility for sale and distribution of the marijuana: he was going to sell to his own customers not, like the appellants in *Greene,* to the government. We decline to find outrageous conduct on the part of the government.

## V

We conclude that the evidence was sufficient for the jury to find that Pemberton and Guinn had entered into an agreement and hence into the conspiracy. The jury instruction was substantively correct and any deviation from Pemberton's request did not prejudice his case. The government's conduct was not grossly shocking or so outrageous as to violate a universal sense of justice.

AFFIRMED.