978 F.2d 1266
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Hugo Leigue CANAMARI, aka Hugo Leige, Defendant-Appellant.
 No. 87-5207.
 United States Court of Appeals, Ninth Circuit.
 Submitted Sept. 18, 1992.*
Decided Nov. 4, 1992.
 
 1
 Before WIGGINS, KOZINSKI and KLEINFELD, Circuit Judges
 
 
 2
 MEMORANDUM**
 
 
 3
 On April 17, 1987, a jury convicted defendant Hugo Leigue Canamari of violating 21 U.S.C. § 963, conspiracy to import cocaine. On June 29, 1987, Leigue received a three and one half year prison term and a fifty dollar special assessment fee. Leigue filed a Notice of Appeal in compliance with Fed.R.App.P. 4(b). We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.
 
 I. Facts
 
 4
 In January, 1986, Ferris Ashley, a DEA informant, learned that John Malpezzi was looking for a pilot and a crew to assist in the smuggling of cocaine from Bolivia to the United States. With the approval of DEA Agent Gregory Lee, Ashley met with Malpezzi and offered to handle the transportation of the cocaine.
 
 
 5
 On February 3, Malpezzi introduced Ashley to Romula Rojas and Jose Leon, who primarily were responsible for providing the drugs. Ashley introduced Rojas and Leon to undercover DEA agents Gregory Lee and Michael Moren, who posed as Ashley's pilot. With various stops and starts, over the next few months these parties and defendant Hugo Leigue Canamari, who entered the drug smuggling scheme in March, plotted to smuggle anywhere from 100 to 700 kilograms of cocaine from Bolivia to the United States. Ultimately, the parties agreed that Agents Lee and Moren would take delivery of a 700 kilogram load of cocaine at El Trompillo Airport in Bolivia on June 29.
 
 
 6
 On June 28, Rojas and Leigue notified Agents Lee and Moren that they could not use El Trompillo Airport as planned because of the unexpected arrival there of two large military aircraft. Later that same day, Agents Lee and Moren telephoned Leigue and suggested the use of an alternative airstrip in Panama. The agents also indicated that they could arrange for immediate payment of $1,600,000 cash in Panama to cover the cost of the 200 kilograms of cocaine not covered by a proposed letter of credit. Leigue agreed both to the Panamanian pickup site and to go to Panama to pick up the cash. While in Panama, Leigue was arrested.
 
 II. Discussion
 
 7
 Leigue argues that the evidence is insufficient to support his conviction for conspiracy to import cocaine. In considering a challenge to the sufficiency of the evidence, we decide "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original); United States v. Medina, 940 F.2d 1247, 1250 (9th Cir.1991). "The test is whether the evidence and all reasonable inferences which may be drawn from it, when viewed in the light most favorable to the government, sustain the verdict." United States v. Davis, 932 F.2d 752, 761 (9th Cir.1991).
 
 A. Leon Is Not the Law of the Case
 
 8
 We quickly dispose of the government's argument that this court's decision in United States v. Leon, No. 87-5177, constitutes law of the case. It is axiomatic that law of the case requires an identity of the parties to be bound. See, e.g., United States v. Guy, 903 F.2d 1240, 1242 (9th Cir.1990) (refusing to apply law of the case where case involved different parties convicted in different trials); United States v. Brown, 761 F.2d 1272, 1276 (9th Cir.1985) ("Brown was not a party in Goetz, and thus Goetz is not binding as law of the case...."); United States v. Maybusher, 735 F.2d 366, 370 (9th Cir.1984) (refusing to apply law of the case where "Maybusher was not a party to the final proceedings in Emens II, and his ultimate conviction did not occur as a result of the same trial as his co-defendant."), cert. denied, 469 U.S. 1110 (1985). Because Leon did not involve Leigue as a party, it does not and could not constitute law of the case.[1]
 
 
 9
 B. The Record and Relevant Case Law Support Leigue's Conviction for Conspiracy to Import Cocaine
 
 
 10
 The essential elements of a conspiracy are (1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime. United States v. Hill, 953 F.2d 452, 457 (9th Cir.1991); United States v. Medina, 940 F.2d at 1250; United States v. Ray, 930 F.2d 1368, 1371 (9th Cir.1990). Once the existence of a conspiracy is shown, evidence establishing beyond a reasonable doubt a knowing connection of the defendant with the conspiracy, even though the connection is slight, is sufficient to convict him of knowing participation in the conspiracy. United States v. Ray, 930 F.2d at 1371; United States v. Litteral, 910 F.2d 547, 550 (9th Cir.1990).
 
 
 11
 The gravamen of Leigue's argument that the evidence was insufficient to support his conviction for conspiracy to import cocaine is that the first requisite of the crime of conspiracy--the existence of an agreement--is absent in his case. Specifically, he argues that on June 28, 1986, when Rojas and Leigue balked at the El Trompillo Airport pickup site, the parties reached an irreconcilable impasse that "terminated" the negotiations because the pickup site was an absolute deal breaker. Leigue thus argues that under this court's decision in United States v. Melchor-Lopez, 627 F.2d 886, 892 (9th Cir.1980), his conviction cannot stand. Unfortunately for Leigue, neither the record nor Melchor-Lopez supports his argument.
 
 
 12
 1. The Record Supports Leigue's Conviction for Conspiracy
 
 
 13
 In support of his argument that disagreement over the pickup site constituted an irreconcilable impasse that "terminated" the negotiations, Leigue relies on the testimony of government agents Moren and Lee. However, careful examination of the record reveals that neither the testimony of Agent Moren nor of Agent Lee supports Leigue's argument. For example, Agent Moren specifically testified that after Leigue and Rojas refused the first pickup site, both Agent Moren and Agent Lee suggested an alternative site and that neither he nor Agent Lee thought at that time that Leigue and Rojas could not or would not deliver the cocaine to that site. Agent Moren had no doubt that Leigue's commitment to the drug smuggling scheme endured.
 
 
 14
 Similarly, Agent Lee indicated in his testimony that, although the parties had reached an impasse on the pickup site, at no time did he consider that impasse to have broken the deal. In fact, Agent Lee testified that Agent Moren suggested an alternative pickup site that Leigue accepted. Specifically, Agent Lee testified:
 
 
 15
 We called Hugo Leigue at his home and told him that the strip at the Panamanian border was our alternative to what had taken place--our alternative to El Trompillo airport. And Hugo Leigue said that that was fine, that they would accept that, and then he and the informant later left Bolivia.
 
 
 16
 Thus, while the conspiracy to import cocaine changed in certain respects, the drug smuggling scheme remained firm and Leigue's commitment to the scheme endured. As far as Leigue was concerned, there not only was agreement to smuggle cocaine, but also agreement on the alternative pickup site. Even if the jury thought the criminal conspiracy ended when the parties to it disagreed on the delivery location, the jury nevertheless could have found an agreement and an overt act prior to that time. No more is required.
 
 
 17
 Accordingly, under Jackson's command to consider the record as a whole and view the evidence in the light most favorable to the prosecution, it was not irrational for the trier of fact to find the existence of a drug smuggling agreement and that Leigue had committed himself to that agreement before he balked at the El Trompillo Airport pickup site.
 
 
 18
 2. Ninth Circuit Precedent Supports Leigue's Conviction
 
 
 19
 Even were the record as clear as Leigue argues, United States v. Melchor-Lopez, 627 F.2d 886 (9th Cir.1980), would not command that Leigue's conviction be reversed.
 
 
 20
 Melchor-Lopez stands for the proposition that engaging in preliminary negotiations and even partially accepting proposals, but stating a precondition not met, is not a conspiracy. Id. at 892. In Melchor-Lopez, the defendant, in an initial meeting with government agents, indicated that he was able and willing to sell heroin, but only upon certain conditions that he imposed. Particularly, he refused to front the transaction and would not transport the heroin into the United States. First, contrary to the government's contention at trial, these preconditions led the government agents involved to conclude that no agreement had been reached and that the transaction could not be managed:
 
 
 21
 Indeed, Noriega, the government's informant, testified that no agreement had been reached because Rina maintained that "the first transaction had to be fronted to him in the United States," and that Melchor-Lopez insisted that "he was no going to bring it [the heroin] into the United States," that "he was not going to front it," and that if Rina wanted to transact one kilogram of heroin, "Rina needed to commute to Mexico."
 
 
 22
 Id. at 888 (emphasis added). Second, the preconditions set by Melchor-Lopez never were met, and accordingly he "steadfastly refused to agree to any such transaction." Id. at 889. Under those circumstances, this court held that the government had shown no more than a conspiracy to attempt to arrange a purchase rather than an agreement to carry out an illegal act; Melchor-Lopez had consented to nothing more than his appearance at a meeting.
 
 
 23
 Here, Leigue consented to much more. Indeed, on June 27, merely two days before the pickup was to take place, Leigue and his associate had agreed to and explained the basic plan to Agent Moren in a very detailed way:
 
 
 24
 Mr. Rojas and Mr. Leigue both spoke about the plan that was going to take place on the 29th. Mr. Rojas was stating quite technical things and I had a little difficulty, with the amount of Spanish that I had, understanding what he was saying. And Mr. Leigue was translating and making suggestions both ways, I believe.
 
 
 25
 The basic plan was that they had 700 kilograms of cocaine ready at this time and it was about 30 minutes away from El Trompillo airport. They apparently had a hangar at the airport, a place to put our plane, a place to put some cargo in the airport.
 
 
 26
 We didn't know if we could get a plane in or not, but they would bring the cocaine to that location, to the hangar, and we would come fly in in a really specified time, 10 minutes either way, park outside the hangar, the people in the hangar would bring the cocaine to the airplane, put it onboard the airplane, and we'd take off.
 
 
 27
 Quite obviously, and in contrast to Melchor-Lopez, Leigue had agreed to much more than his presence at a meeting; he had, in fact, agreed to engage in the criminal activity of smuggling drugs.
 
 
 28
 Moreover, unlike the defendant in Melchor-Lopez, at no time did Leigue insist upon a specific pickup site as a precondition to agreement. Instead, it was not until the day before the scheduled June 29 pickup, long after Leigue's commitment to the drug smuggling scheme was firm, that he objected to the proposed pickup site. In fact, when Leigue and Rojas boycotted the initial pickup site, they readily agreed to another. Because the jury could have concluded that Leigue would not have flown to Panama were he not confident that the criminal agreement for the sale of cocaine was firm, the last minute discussion of where to make delivery to avoid the military planes was not material to whether an agreement existed.
 
 
 29
 Leigue's interpretation of Melchor-Lopez is not only erroneous, but would eviscerate this court's opinion in United States v. Sharif, 817 F.2d 1375 (9th Cir.1987). In Sharif, this court found the presence of a conspiracy where the parties had agreed to carry out an illegal objective but had not settled all of the terms of the agreement, particularly price and quantity. Distinguishing Melchor-Lopez, the court stated:
 
 
 30
 The defendant extrapolates from this case a general rule that as a matter of law there can be no conspiracy without proof of an agreement not merely to carry out an illegal objective but also on such terms as price, quantity, and time, place, and manner of delivery. Our decisions, however, do not create such a requirement, for we have held proof of conspiracy sufficient where the actual buyer and seller never agreed to such terms. We have recognized the existence of a conspiracy between intermediaries where the principal was a government agent and the contemplated transaction never transpired. In this light, Melchor-Lopez must be examined with some care.
 
 
 31
 Id. at 1377 (citations omitted); see also United States v. Kiriki, 756 F.2d 1449, 1453-55 (9th Cir.1985) (finding existence of a conspiracy where parties had at least some of the specifics worked out in their agreement to traffic in stolen jewelry).
 
 
 32
 More recently, this court relied upon Sharif to support the presence of a conspiratorial agreement in United States v. Pemberton, 853 F.2d 730 (9th Cir.1988). In Pemberton, one of the defendant's associates would not agree to take part in an operation until he had inspected the marijuana involved. Relying on Melchor-Lopez, the defendant argued that this negated the existence of a conspiratorial agreement. This court disagreed and, analogizing to Sharif, held that where the parties had worked out specifics, such as where to store and package the marijuana, and had purchasers in mind, the defendant's associate's expressed desire to inspect the marijuana did not refute that the defendant was in the conspiracy proper. Id. at 733.
 
 
 33
 We abide by Sharif 's command to examine Melchor-Lopez "with some care" and unhesitatingly conclude that Leigue's case falls within the ambit of Sharif and Pemberton and not Melchor-Lopez. In Melchor-Lopez, the defendant had "firmly refused to commit himself" to participate unless the transaction took place in Mexico and until money for the drugs was delivered in advance, neither of which occurred. The record demonstrates that Leigue insisted upon no such preconditions before committing himself to the drug smuggling scheme in this case. As did the defendant in Sharif, Leigue agreed to the criminal objective, making only a last minute objection to a specific detail. We require no more to find the existence of an agreement to engage in criminal activity.
 
 III. Conclusion
 
 34
 Accordingly, Leigue's conviction for conspiracy to import cocaine is AFFIRMED.
 
 
 
 *
 The panel finds this case appropriate for submission without argument pursuant to Fed.R.App.P. 34(a) and 9th Cir.R. 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Moreover, even if Leigue had been a party in Leon, the government's argument would fail for yet another reason. Law of the case precludes reconsideration only of those issues decided explicitly or by necessary implication in the court's previous disposition. Liberty Mut. Ins. Co. v. E.E.O.C., 691 F.2d 438, 441 (9th Cir.1982); see also Milgard Tempering, Inc. v. Selas Corp. of America, 902 F.2d 703, 715 (9th Cir.1990) ("For the doctrine to apply, the issue in question must have been 'decided explicitly or by necessary implication in [the] previous disposition.' ") (citation omitted). Because Leon did not address the specific issue in this case--whether Leigue placed a precondition on his participation in the alleged conspiracy--it could not constitute law of the case